CASE 80—ACTION BY VERNON RICHARDSON AGAINST THE EVENING POST
Co., FOR LIBEL.—JUNE 6.

# Evening Post Co. v. Richardson.

APPEAL FROM BOYLE CIRCUIT COURT.

JUDGMENT FOR PLAINTIFF AND DEFENDANT APPEALS.  REVERSED.

LIBEL—PARTS OF PUBLICATION STRICKEN FROM PETITION—CHARGE OF
CORRUPTION IN DISCHARGE OF DUTY AS ELECTION OFFICER—QUAL-
IFIED PRIVILEGE—QUESTION OF MALICE FOR JURY—INSTRUCTIONS
TO JURY.

Held:   1. In an action for libel, based on a communication to de-
fendant's newspaper charging plaintiff with corruption in the
discharge of his duties as an election officer, parts of the com-
munication criticising the conduct of the political party to which
plaintiff belonged were properly stricken from the petition.

2. Charges that plaintiff fraudulently and corruptly refused to count
certain ballots which had been cast by regular voters, and
that he had fraudulently refused to permit certain legal vot-
ers to cast their votes, upon the plea that they were not reg-
istered, are actionable only so far as they imputed to plain-
tiff corruption in the discharge of his duty as an election
officer.

3. Fair and reasonable criticism of the conduct of a public officer,
if based on facts, is not libelous.

4. In an action for libel, based on a communication published in
defendant's newspaper charging plaintiff with corruption in the
discharge of his duty as an election officer, the fact that the
communication was sent to defendant by a journalist of great
experience, prudence, and accuracy, and that defendant, in good
faith, believed each statement therein to be true, furnishes a
sufficient basis for the plea of qualified privilege, and consti-
tutes a good defense.

5. Under such a plea the question of malice is for the jury, and,
while malice is not to be inferred from the mere fact of publica-
tion, it is to be inferred from the falsity of the publication.

6. It is never proper for the trial judge to refuse to submit ques-
tions of fact upon which issue has been formed, if there is any
evidence to sustain a contrary conclusion.

7. Under Civ. Code Prac., section 124, defendant had the right to prove mitigating circumstances, but the court did not err in not giving an instruction calling attention to the specific facts relied on in mitigation.

8. Though parts of the publication complained of were not libelous, it was not error to admit the entire article as evidence.

HELM, BRUCE & HELM, FOR APPELLANT.

ROBT. HARDING, W. J. PRICE & E. V. PURYEAR, FOR APPELLEE. (No briefs in the record).

OPINION OF THE COURT BY JUDGE BURNAM—REVERSING.

This is an appeal from a judgment of the Boyle circuit court. The suit was brought by the appellee, Vernon Richardson, against the appellant, the Evening Post Company, to recover damages for having falsely and maliciously published in the Evening Post, a newspaper owned and published by the appellant, a communication from Thomas M. Green which contained the following words:

"It was in the Fourth precinct in Danville that the effulgent luminary, Vernon Richardson, discovered that Taylor's majority could be reduced twenty-four votes by throwing out the ballots on which the preference of the voter was indicated with the wrong end of the stencil, and thus a small contribution could be made from Boyle to the gigantic fraud by which it was intended to steal the entire State for Goebel; and it was this brilliant scheme to which the Goebelite county commissioners, Baughman and Surber, gave effect. Had the same nefarious violation of the law been impartially perpetrated all over the county, Taylor would have carried it by a good majority, and Boyle would have a Republican representative.

"A colored man named Owsley was refused registration because he, while iming Danville as his home, where for years he had been a voter, had obtained temporary employment in Nicholasville several months before the registra-

Evening Post Co. v. Richardson.

tion day. His right to be registered and vote was indubitable, and his disfranchisement was a wrong which those who did it thought could be done with impunity. A respectable colored man, named Frank Williams, who had been a voter in Danville for a score of years, applied for registration, and was registered; the Goebelite clerk of the registration recording him as Ike Williams. He offered to vote at No. 4 precinct, but this right was denied him by Vernon Richardson. He proved that he was a legal voter in that precinct; that he applied for registration, and had been registered. He established his identity with the man who was registered as Ike Williams. He proved by the Goebelite clerk, Tom Nins, that the error was that of the clerk, and not that of the voter. But Richardson had been appointed for a purpose, and was a case whom circumstances could not alter. The man's unquestionable right to vote was fraudulently trampled upon by Richardson.

"A young colored man, named John Green, Jr., was refused the right to vote by the same man, on the same shabby and shallow and fraudulent pretext that the Goebelite clerk had misspelled his given name. The colored family of which young Green was a member had come to Kentucky with his master more than 115 years ago, when it was still a wilderness, and had helped to clear the canebrakes, to fell the forest, and to man the forts. As slaves, they were industrious, trustworthy, faithful and obedient. His master, discerning capacity in this young man's grandfather, Henry Green, had him educated as well as the then existing environments admitted, and provided for his emancipation. Henry Green became a minister of the Gospel, and went as a missionary to Liberia, and, after creditable service there for some years, returning to Kentucky, labored until his death to lead the people of his race in the way of right-

cousness. The young man's father and himself were both born in freedom, and have lived in Danville all their lives. I do not know the young man whose legal vote was rejected, but I did know his grandfather, and know his father, and out of that knowledge, I now say this: That if the life of the man who did him this wrong, had, prior to that act, been as cleanly self-respectful, as free from blame, as were their lives, then his conduct on that day was most unaccountably inconsistent with such life, and the gross wrong he did the young colored man was passed, but a rank injustice he did to his own character.

"These instances are but specimens of other wrong that were done by the Goebelites in Boyle, and in almost every county in the State. The poor tools who perpetrated them would have hesitated long before venturing like trespass upon any white man who, knowing his rights, had courage to defend, and who possessed the ability and skill to maintain them. Such creatures will flaunt as gaudy feathers in their caps these successful aggressions upon the right of man, the unhappy conditions environing whose race rendered gentlemen the more scrupulous in respecting these rights. These men strut around like so many little cock sparrows over their magnificent triumph in trampling upon the weak and friendless, apparently all oblivious to the fact that these wrongs were equally a trespass upon every white man who voted as those colored voted, some of whom they will never attempt to bully, and all of whom may in time be aroused by such villanies to discharge obligations that they owe to the lowly, whose cause is their own, and who kneel to the same God, who holds all men in the hollow of his hand.

"It is more than probable that the fit tools of men even worse than themselves will be applauded by those who set

Evening Post Co. v. Richardson.

them on; by men with minds so warped by partisan prej-
udice and passion, minds so naturally and essentially mean
and dishonest in all their operations that it is impossible
for them to tell the truth, or even see it, as impossible for
them to refrain from any infamy by which political oppo-
nents may be defrauded and robbed, and the real will of the
people defrauded, as it would be for a muley cow to climb a
tree and have a calf in a crow's nest.  But by every Ken-
tuckian, who loves truth and honor, who values justice
and fair play among men, wherever he may live, and under
whatsoever banner he may array himself, such acts of
fraud or unblushing wrong or mean aggression as were
perpetrated by slavish tools of Goebel in Boyle and all the
State are now, and will ever be, execrated as they deserve to
be.  In the unbiased judgment of every such man, the
mangiest negro shooter in Danville workhouse was put
there for offenses less grave, far less threatening to the
peace and good order of society, far less demoralizing to
the youth of the State, far less dangerous to the public
weal, infinitely less pernicious in every tendency and re-
sult than were the crimes against the elective franchise
which were perpetrated at the election, and are still med-
itated by myrmidons of men who, having failed to secure
the State, are scheming to seize upon it by violence and
now promise a siege of fire and blood unless their demands
are met with a surrender at once base and cringing; men
who seemingly act upon the belief that all their own friends
are the vilest of scoundrels, and all of their opponents are
the most abject and truckling cowards. Events have shown
that they have been slightly deceived in the one, and rapid-
ly approaching results will assuredly prove, to their con-
fusion, that they are most egregiously mistaken in the
other."

Upon motion of the defendant all that part of the article beginning with the words "and it was his brilliant scheme," and ending with the words, "with impunity," were stricken out, as were the words beginning, "These instances are but," and ending with the words "egregiously mistaken in the other," to which the plaintiff excepted. The publication contains many opprobrious epithets, which, however, are, in the main, a criticism of the conduct of the Democratic party in the election held in November, 1899, for the election of State officers and members of the Legislature. This part of the publication is not libelous, and no action can be maintained therefor by the plaintiff. The parts of the petition which were stricken out belong to this class, and the circuit judge did not err in sustaining the motion to strike them out. The publication contains only three specific charges against the plaintiff for which he could maintain an action. They are: First, that the plaintiff had fraudulently and incorrectly refused to count 26 ballots which had been cast by legal voters; second, that he had fraudulently refused to permit Frank Williams, a legal voter, to cast his vote, upon the pretext that he was not registered; third, that upon the same shallow and fraudulent pretext he had denied John Green, Jr., the right to vote. These charges are actionable only so far as they imputed to plaintiff corruption in the discharge of his duty as an election officer. The defendants answered in three paragraphs. In the first they allege, in substance, that the communication was sent to them by a journalist of great experience, prudence and accuracy; that, when the communication was received and published, they, in good faith, believed each statement made therein to be true, and that the communication was a fair and just comment upon the manner in which plaintiff had conducted the election as

judge of precinct No. 4 in Boyle county; and that the publication was in regard to the discharge of an official duty by one occupying a public office,—and interposed a plea of qualified privilege. The second paragraph of the answer admits the publication, and avers that the statements made therein are true. The third paragraph of the answer set out substantially the same facts relied on in the first paragraph in mitigation of any damages which the jury might believe plaintiff had sustained. The trial court sustained a general demurrer to the plea of qualified privilege, decided that there was no testimony on which to base the second paragraph, and instructed the jury that the publication was libelous, and that they should find for the plaintiff. in damages, such sum as they believed from the evidence would reasonably and fairly compensate him for mental humiliation and mortification, and for injury to his name and reputation. The court also refused to give an instruction as to mitigating circumstances. The trial resulted in a verdict and judgment in favor of the plaintiff, which we are asked, upon this appeal, to reverse. Appellants assign numerous errors in their motion and grounds for a new trial, but we will consider only those which we regard as important and prejudicial.

The plea of qualified privilege, relied on in the first paragraph of the answer, does not go to the extent of justification for the alleged slander. "It means nothing more than the occasion of making it rebut the *prima facie* inference of malice arising from the publication of matter prejudicial to the character of the plaintiff, and throws upon him the onus of proving malice in fact, but not of proving it by extrinsic evidence only. He has still the right to require that the alleged libel itself shall be submitted to the jury, that they may judge whether there is evidence of malice on the

face of it." See Wright v. Woodgate, 2 Compton, M. & R., 573. The distinction between publications made in good faith in the discharge of a moral, social, or legal duty, and those which involve the slander of a private person, has always been conceded by both text writers and the courts. See Newell, Defam. (2d Ed.), 389-392; Folk. Starkie, Sland. & L., sections 670, 688; Odgers, Libel & S., p. 31; Townsend, Sland. & L., section 209; Gagerman, Privileged Communications, pp. 229, 242. In the case of Miner v. Tribune Co., 49 Mich., 358, 13 N. W., 773, Judge Cooley, in setting aside the judgment in favor of Miner, uses the following language: "The defendant contends that to call public attention to a matter that so vitally concerns the public is a matter of privilege, and that, by the presumption of law, its motives in doing so must be deemed proper, and not actuated by malice. The trial judge denied this claim altogether. In doing so he put the case on precisely the same footing with publications which involve merely private gossip and scandal. The truth was allowed as a defense, if made out; and so it would have been if the injurious charge which was published had been one in which the public was not concerned. If there is no difference in moral quality between the publication of mere personal abuse and the discussion of matters of grave public concern, then this judgment may be right, and should be affirmed. But it is very certain. I think, that no declaration of this or any other court can convince the common reason that this distinction is not plain and palpable. Few wrongs can be greater than the public detraction which has only abuse, or profit from abuse, for its object. Few duties can be plainer than to challenge public attention to official disregard of principles which protect public and personal liberty." And the question has been most ably and clearly discussed in the case

of White v. Nicholls, 3 How., 266, 11 L. Ed., 591. In that case, after a full and careful review of all the English and American authorities, Judge Daniel said: "(1) Every publication, either by writing, printing or pictures, which charges upon and imputes to any person that which renders him liable to punishment, or which is calculated to make him infamous or odious or ridiculous, is *prima facie* a libel, and implies malice in the author and publisher towards the person concerning whom such publication is made. Proof of malice, therefore, in the cases just described, can never be required of the party complaining, beyond the proof of the publication itself. Justification, excuse or extenuation, if either can be shown, must proceed from the defendant. (2) The description of cases recognized as privileged communications must be understood as exceptions to this rule, as being founded upon some apparently recognized obligation or motive, legal, moral, or social, which may fairly be presumed to have led to the publication, and therefore *prima facie* relieves it from that just implication from which the general rule of law is deduced. The rule of evidence as to such cases is accordingly so far changed as to impose it on the plaintiff to remove those presumptions flowing from the seeming obligations and situations of the parties, and to require of him to bring home to the defendant the existence of malice as the true motive of his conduct. Beyond this extent no presumption can be permitted to operate, much less be made to sanctify the indulgence of malice, however wicked, however express, under the protection of legal forms. . . . Proof of express malice in any written publication, petition or proceedings addressed to such tribunal will render that publication, petition or proceeding libelous in its character, and actionable, and will subject the author and publisher thereof to all the consequences of

libel; and we think that, in every case of a proceeding like those just enumerated, falsehood and the absence of probable cause will amount to proof of malice." Odgers, Libel & S., p. 28, says: "It is one thing to comment upon and criticize, even with severity, the proven acts of a public man, and quite another to assert that he has been guilty of particular acts of misconduct." So far as we are advised, the only case in which this question has been considered by this court was in the case of Vance v. Courier-Journal Co., 95 Ky., 41 (15 R., 412) 23 S. W., 591. In that case a publication appeared in the Courier-Journal charging that Vance had violated his oath of office as a supervisor of election, and with interfering with and bribing voters. The court instructed the jury to award the plaintiff damages if they believed the publication false and was made maliciously, and that malice was to be inferred or presumed from the falsity of the publication, but that if they believe the statements contained in the publication were substantially true, as published, or were reasonable and fair criticism of the acts and conduct of the plaintiff as supervisor, and were made in good faith and without malice, they should find for the defendants; and the court held, in an opinion written by Judge Hazelrigg, that these instructions were substantially correct, and that the jury were the judges of the truth of the matter put in issue, and were also the judges of the reasonableness of the grounds upon which the newspaper's charges were based; that animadversions upon the conduct of a public officer, however severe, were not libelous, if confined within the limits of fair and reasonable criticism, and based on facts. See sections 8, 9, Bill of Rights, Const. After a careful consideration of the whole question, the court has determined to adhere to the general rule of law laid down in this case—that the question

of malice in the publication should be submitted to the jury, and is to be inferred from the falsity of the publication. The cases of Riley v. Lee, 88 Ky., 603 (11 R., 586) 11 S. W., 713, 21 Am. St. Rep., 358, Courier-Journal Co. v. Sallee (20 Rep., 635) (47 S. W., 226), and Press Co. v. Tennelly (20 R., 1235) (49 S. W., 15), do not involve the question of privileged communications at all, but only the liability for the publication of libelous matter about a private individual. The lower court therefore erred in sustaining a general demurrer to the first paragraph of the answer. And the rule is well settled that it is never proper for the trial judge to refuse to submit questions of fact upon which issue has been formed, if there is any evidence tending to sustain a contrary conclusion. And in our opinion, the plea of justification contained in the second paragraph should have been submitted to the jury. Whilst appellant had the right, under section 124 of the Civil Code of Practice, to prove mitigating circumstances, we think the court did not err in not giving a special instruction calling the attention of the jury to the specific facts relied on in mitigation. We are also of the opinion that the entire article was properly admitted as evidence.

As the probabilities are that similar conditions will not again exist, we do not pass upon the alleged error of the trial court in refusing a change of venue asked for by appellant. But for reasons indicated, the judgment is reversed, and cause remanded for proceedings consistent with this opinion.

Whole court sitting.