## Herald Publishing Company, et al. v. Feltner.

(Decided March 17, 1914.)

### Appeal from Leslie Circuit Court.

1. **Libel and Slander—Truth a Complete Defense.**—In an Action for libel the truth is always a complete defense, although the pub-

lication may be inspired by malice or ill-will and be libelous per se.

2. Libel and Slander—Pleading—Sufficiency of Answer Pleading Truth.—When the words complained of make a specific charge, as that "A" stole the horse of "B," then an answer that admits the publication of the words and pleads that they were, in substance, true, and that "A" did steal the horse of "B," will be good; but where the imputation complained of is a conclusion or inference from certain words, a plea of justification must show the existence of a state of facts which will warrant the inference of the truth of the charge, and the mere averment that the charge is true is not a sufficient answer.

3. Libel and Slander—Words That Are Actionable Per Se.—A publication charging that a man was a "henchman" of a lawless character, a "fugitive from justice" and "an outcast" was libelous per se, as these epithets are calculated to bring the person to whom they are applied into odium and contempt, degrade him in the estimation of society, as well as reflect on his character.

LEWIS & LEWIS, A. T. W. MANNING, BENJ. S. WASHER, J. C. JONES and H. C. FAULKNER for appellants.

CLEON K. CALVERT for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellee, as plaintiff below, brought this libel suit against the Herald Publishing Co. and George A. Newman, its editor, to recover damages for an alleged libelous publication that appeared in the Louisville Herald, a newspaper published by the Herald Publishing Co. The headlines of the article complained of are as follows:

"Beckham will be asked to pardon Hargis Henchman. Petition being circulated to secure executive clemency for Felix Feltner, now fugitive in the far West. Breathitt man's boast of power under test. Will the Governor yield to pressure or defy feudist's influence?"

The body of the publication reads: "Lexington, Ky., June 8.—For the first time since the Breathitt feud cases began to occupy the attention of the courts of the State four years ago, Gov. J. C. W. Beckham is to be called upon to exercise the pardoning power in behalf of one of the henchmen of Judge James Hargis. It was due to the boast of the Breathitt feud leader and politician that he could get any man in the penitentiary pardoned that caused many of his followers to stand in with him and Sheriff Callahan, and now one of them is cir-

culating a petition through his son asking executive clemency.

"It was during the trial of the Marcum-Hargis damage suit in Winchester three years ago that several of the principal witnesses against the Hargises were spirited out of the State, and at the conclusion of the trial the attorneys for Mrs. Marcum instituted contempt proceedings against Jim Hargis, Ed. Callahan and Felix Feltner on the ground that they were responsible for the disappearance of the witnesses. Felix Feltner is a double first cousin of Mose Feltner, the first of the alleged Hargis henchmen to make a confession in which he charged the Hargises with forming a conspiracy to have Marcum, Cockrill and Dr. Cox killed at Jackson, and it was charged that Felix Feltner was used by Hargis and Callahan as the go-between to get his cousin, Mose, out of the State.

"Sentenced to two years. When the contempt proceedings against Felix Feltner went to trial before a jury in the Clark Circuit Court, Mose Feltner took the witness stand and testified against his cousin, and the jury promptly returned a verdict fixing the penalty at a fine of $3,000 and two years in jail. Immediately after the verdict had been returned, a son of the convicted man, residing in Leslie County, set about to raise the money to pay the fine. He was compelled to sell the family farm in the mountains and secure contributions from friends to meet the demands of the court, and after he had raised sufficient money to pay the fine, he circulated a petition asking the Governor to pardon his father from the jail imprisonment.

"Feltner is a fugitive. Although the family of Feltner was forced to part with its little mountain home, it is said repeated appeals to the Hargises and Callahans to advance money to meet the demands of the Clark Circuit Court availed nothing. Frequent efforts of the officers of the Commonwealth to find Felix Feltner during the recent trial of Judge Jim Hargis in Lexington, where he was badly wanted as a witness, proved fruitless, and it is reported throughout the mountains that he has gone to the far West, where he will remain forever unless the efforts of his son to secure a pardon for him are rewarded by Gov. Beckham.

"Feltner was formerly Circuit Court Clerk of Leslie County and also held several other county offices pre-

vious to the time he began his career in the interests of the Breathitt feud leaders, since which time he has become practically an outcast. The money, $2,500, given to him by Judge Hargis as a reward for Mose Feltner if he remained out of the State until after all of the trials growing out of the assassination of Cockrill, Marcum and Dr. Cox, is still tied up in the Winchester bank by order of the court, and a suit instituted by Mose Feltner to get the money is now pending against Felix Feltner."

In answer to this suit, the defendants, in one paragraph denied that the article set forth in the petition was published maliciously or inspired by malice or ill-will toward the plaintiff, or with any purpose or intention to injure him; denied that it was falsely published or was false in any of its recitals affecting the plaintiff.

In a second paragraph it was averred "That the recitals touching the plaintiff contained in the publication complained of are each and all substantially true and were each and all substantially true when said publication was made in the Louisville Herald." This paragraph also set out at length the facts and circumstances tending to show the truth of the publication.

In another paragraph it was pleaded that the publication complained of was privileged in that it was a fair statement of proceedings in the Clark Circuit Court, all of which were borne out by the records of that court, and constituted a legitimate item of news.

On motion of the plaintiff, all of the second paragraph except the plea of truth and justification above set forth, was stricken out.

While we do not think the court committed any substantial error to the prejudice of the defendants in sustaining the motion to strike from its answer the matter setting out in detail the reasons why the publication was true, it was, nevertheless, an erroneous ruling. The law, as we understand it, is that when the words complained of make a specific charge, as that "A stole the horse of B," then an answer that admits the publication of the words and pleads that they were in substance true and that "A" did steal the horse of "B" will be good, but where, as in this case, the imputation complained of is a conclusion or inference from certain words, a plea of justification must show the existence of a state of facts which will warrant the inference of the truth of the charge, and the mere averment that the charge is true is not a sufficient answer: Newell on Slander and Libel,

page 652. In Townshend on Slander and Libel, section 355, in discussing this question, it is said:

"The distinction seems to be that where the charge is a conclusion or inference from certain facts, there the plea must set up the facts which warrant such an inference; but where the charge is of some specific act or acts, there it is sufficient if the plea allege that the charge is true. Thus, if it be said of a man, that he is a swindler, this is an inference from his actions, and which can be proved only by showing acts of fraud on the part of the plaintiff amounting to swindling; and, therefore, as we have seen, to justify a charge of being a swindler, the plea must allege the facts upon which the defendant relies to make out the charge."

Without devoting further time to the pleadings, it appears that after the issues had been made up the case went to trial before a jury, and there was a verdict and judgment in favor of Feltner for $5,000, and the defendant appeals.

That part of the publication that furnishes the basis of the action is the charge that Feltner was a "henchman of Hargis," a "fugitive from justice" and practically "an outcast," and if the evidence supports, without contradiction or room for reasonable difference of opinion, the defense that these epithets were substantially true, it would necessarily follow that the jury should have been directed to find a verdict for the defendant, because the truth is always a complete defense, although the publication may be inspired by malice or ill-will and be libelous *per se;* Vance v. Louisville Courier-Journal Co., 95 Ky., 41; Rollins v. Louisville Times Co., 139 Ky., 788; Ratcliffe v. Louisville Courier-Journal Co., 99 Ky., 416; Evening Post Co. v. Richardson, 113 Ky., 641; Courier-Journal Co. v. Phillips, 142 Ky., 372; Townshend on Slander & Libel, section 211; Newell on Slander & Libel, page 651.

But preliminary to relating the substantial facts disclosed by the evidence and which it is claimed establish the truth of the publication and justified the use of the actionable words, it may be well to state the general reputation of Hargis as shown by the record. At the time of the publication, and for many years prior thereto, James Hargis, now deceased, was and had been one of the most notorious characters in the State. His name, whether justly or not, was connected in an incriminating way with criminal offenses that took place in Breathitt

County where he lived, and the public generally believed that he was guilty of many of the charges made by the press of the State, some of which found their way into the courts in the form of criminal proceedings against him. His reputation throughout the State, on account of these publications and criminal proceedings, was that of a lawless man who was willing to resort to any means, however vicious and reprehensible they might be, to accomplish his purposes, although it might be necessary to do violence to those who had incurred his enmity or interfered with his political plans.

And in saying that Feltner was a "henchman of Hargis" the publication, in effect, charged, and must have been generally understood as charging by those who read it, that he was a servile assistant and subordinate of Hargis, ready and willing to do his bidding, although it might involve the doing of things that were unlawful and disreputable.

To further say of him, as did the publication, that he was a "fugitive from justice," necessarily implied that he had committed some offense or violated some law and to escape punishment had fled the country or was concealing himself from some writ or process of the court, or was failing or refusing to render himself amenable to orders of the court that might subject him to some kind of loss or disadvantage or embarrassment; and the further charge that he was practically "an outcast" represented him as being a degraded and disgraced character.

The foregoing definitions being the dictionary meaning of the epithets mentioned, as well as their meaning in popular and ordinary use, they would naturally and reasonably bring a person to whom they were applied into odium and contempt; degrade him in the estimation of society, as well as reflect on his character; and so each of these charges was libelous *per se:* Townsend on Slander & Libel, section 176; Newell on Slander and Libel, page 33; Foster-Milburn Co. v. Chinn, 134 Ky., 424; Ranson v. West, 125 Ky., 457; Riley v. Lee, 88 Ky., 603.

Turning now to the evidence which it is claimed by counsel for appellant established the truth of the publication and authorized a directed verdict in favor of the newspaper, we find that Feltner was the only witness introduced on the trial, and that the evidence consists entirely of his testimony and the records of the Clark Circuit Court.

It appears from this that Feltner, at the time of the publication, lived in the town of Hyden, in Leslie County, and, putting the substance of his evidence in narrative form, he testified that he knew Judge James Hargis, but that he never had any connection with the Breathitt County feuds; that he was present at Winchester in the winter of 1904 when the suit of Mrs. Marcum against Judge Hargis, to recover damages for the murder of her husband, was being tried; that in the August preceding this trial, he met Judge Hargis by appointment and obtained from him $1,500, under an arrangement that it was to be turned over to Mose Feltner, a near relative of his, provided Mose, who was an important and material witness against Hargis in the Marcum trial, did not testify falsely against him, or did not testify at all; that he executed his note for the $1,500 to Hargis, but this note was not to be paid in the event Mose complied with his promise not to testify, or if he did testify, told the truth. An additional feature of the transaction was that Hargis agreed not to assist in the prosecution of Mose under an indictment in the Breathitt Circuit Court charging him with the murder of Jesse Fields. It is further shown that while the trial of Marcum v. Hargis was in progress Mose, who had agreed not to be present to testify against Hargis, appeared in person as a witness; that when this condition developed, a friend of Hargis, whom Feltner did not know, handed him a thousand dollars and said to him that if Mose did not testify in the case he was authorized to give it to him; that soon after this, and before Mose was called on to testify, he left Winchester with Mose and went with him to Cincinnati, O., and from there to different other places outside of the State, remaining out of the State and out of the jurisdiction of the Clark Circuit Court until after the Marcum-Hargis trial was over.

The only reasonable and fair inference that can be drawn from this testimony, and much other relating to it that we have omitted, is that Feltner, for a money consideration, agreed, in the first place, to use his influence with Mose to keep him from appearing as a witness against Hargis in a case in which he had been summoned; and, in the second place, that when he found Mose present at the trial in obedience to the process of the court, he, for another money consideration, induced Mose to leave the State, so that he could not be introduced as a witness on the trial.

The record evidence further shows that a few days after Feltner and Mose left the State under the circumstances stated, a rule for contempt was issued against Feltner, charging him with obstructing the administration of justice by persuading and procuring Mose Feltner, Sam Fields and Ruck Cottongame, who were also witnesses, to leave the jurisdiction of the court, and the State for the purpose of depriving Mrs. Marcum of their testimony on the trial against Hargis. This rule also directed the officer to whom it was directed to arrest Feltner, and permit him to give bail in the sum of one thousand dollars. In obedience to this process Feltner was arrested, and, after the contempt proceedings against him had been continued for a term or more, Feltner was put upon his trial before a jury, and his punishment fixed at a fine of $3,000, and confinement in the county jail for two years.

From this judgment, Feltner prosecuted an appeal to this court, and in November, 1906, the judgment was affirmed. A short time after the affirmance of the judgment, Feltner sold some property he owned in Leslie County and satisfied the fine. After the fine had been satisfied, and before the publication complained of was made, a petition, asking the Governor of the State to remit the imprisonment part of the judgment, had been circulated, and this petition was pending with the Governor at the time of the publication.

It further appears from the record that in March, 1907, a *capias pro fine* was issued from the Clark Circuit Court, commanding the sheriff of Clark County to arrest Feltner and keep him in custody until he had satisfied the fine and imprisonment adjudged against him in the contempt proceedings and that this *capias* was returned by the sheriff of Clark County "not found."

It is further shown that, when Feltner prosecuted an appeal from the contempt judgment in the Clark Circuit Court, he executed a supersedeas bond to stay the execution of the judgment, which bond was signed by Judge Hargis and others. The record further shows that some time in the latter part of 1907 the imprisonment part of the contempt judgment was remitted by Governor Willson.

This undisputed evidence we think clearly establishes that Feltner was a "henchman of Hargis." He was apparently willing to, and the record, without contradiction, shows that he did, at the instigation of Hargis, pro-

cure Mose Feltner to disobey the processes of the court and absent himself as a witness when his presence was demanded, and this conduct proved him to be a servile assistant and subordinate of Hargis, ready and willing to lend him his aid for unlawful and reprehensible pur-, poses.

It also puts him, as we think, within the description of being a "fugitive from justice" in the broad meaning of these words. It was not necessary to constitute him a "fugitive from justice" that he should have been fleeing from a criminal prosecution, or that he should have left the State to avoid it, or that a reward should have been offered for his apprehension, or that officers armed with writs of arrest should have been pursuing him. Technically and literally, he was a "fugitive from justice" when he failed and refused to render himself amenable to the orders of the Clark Circuit Court, as he obligated himself to do by the bond that he executed in the contempt proceedings. There was an unsatisfied judgment for imprisonment against him and a warrant for his arrest in satisfaction of this judgment had been returned "not found." These are convincing circumstances that he was endeavoring to evade the execution of the jail sentence as long as he could, or at least until his efforts to secure the pending pardon had failed.

Now was he "an outcast?" The evidence, without contradiction, shows that he accepted money to obstruct the administration of justice; that as a "henchman of Hargis" he was willing to do his bidding to the extent of procuring witnesses to absent themselves from court; that a heavy punishment had been imposed upon him for this flagrant violation of law, and that he had failed to render himself amenable to the processes of the court in compliance with his bond. It seems to us that any man who would do these things for any one, and especially for a character like Hargis, invites the contempt and criticism of right-minded people, and puts himself in the attitude of deserving to be expelled from society as a degraded and disgraced person.

The heavy penalty imposed in the Clark Circuit Court for his misconduct evidences the aggravated nature of his offense, and it would be trifling with the common sense and popular meaning of the words charged to be libelous to say under the facts of this record, that Feltner who was a "henchman of Hargis," and who had com-

mitted at his request one of the gravest misdemeanors known to the law, should yet be compensated in damages because on account of these things a newspaper said he was practically an "outcast."

The publication in all its essential features was substantially true, and so the motion for a peremptory instruction should have been sustained.

Wherefore, the judgment is reversed, with direction for a new trial in conformity with this opinion.