Richard J. AMMON; Waneta L. Ammon; Tiffany Ammon, an infant; Anthony Ammon, an infant; Travis Ammon, an infant, Appellants,

v.

Virgil WELTY; Orville Smith; Mickey Turner; Robert Brewer; and Forrester Burlchardt, Appellees.

No. 1999–CA–001759–MR.

Court of Appeals of Kentucky.

July 12, 2002.

Discretionary Review Denied
by Supreme Court Sept. 10, 2003.

Katie Marie Brophy, Louisville, KY, for appellants.

John T. Fowler III, Louisville, KY, amicus curiae Brief on Behalf of Animal Legal Defense Fund, Inc.

Roy Kimberly Snell, LaGrange, KY, for appellees.

Before EMBERTON, Chief Judge; GUIDUGLI and McANULTY, Judges.

## OPINION

EMBERTON, Chief Judge.

This case arises over the shooting death carried out by the Trimble County Dog Warden of the Ammon family dog, Hair Bear. The trial court dismissed the action and we affirm.

In 1992, the Ammons moved to Trimble County where they lived with their three children on a sixty-three acre farm. Shortly before Christmas of that year they adopted Hair Bear, a stray dog. Hair Bear was never licensed and apparently roamed the area without restraint. A neighbor, Georgia Nuss, often complained about Hair Bear on her property. Although in response to Nuss's complaints, the Ammons tethered Hair Bear to a clothes line, they did not do so everyday, and with only that limited restraint Hair Bear continued to roam. On May 26, 1993, Nuss picked up Hair Bear and delivered him to the residence of the Trimble County Dog Warden, Robert Brewer. Hair Bear was wearing a collar, but nothing to identify him with his owner.

Before expiration of the seven-day waiting period, imposed by Kentucky Revised Statutes (KRS) 258.215, Brewer shot and killed Hair Bear. Brewer testified that he routinely destroyed impounded dogs by shooting them in the head.

The Ammons filed the present action against Brewer and the Trimble County Fiscal Court members alleging that Brewer wrongfully destroyed Hair Bear.

Citing *Franklin County v. Malone*,[1] the appellees have maintained throughout this action that they are entitled to sovereign immunity. *Malone* held that state officers or employees who act within the scope of the traditional role of government are entitled to immunity regardless of whether those actions are ministerial or discretionary. In *Yanero v. Davis*,[2] our Supreme Court overruled *Malone* to the extent it held that a public officer or employee is always immune from tort liability for negligent, or otherwise wrongful, conduct in the performance of the employee's official duties. In *Yanero*, the court reinstated the historical analysis of immunity questions employing the distinction between ministerial and discretionary functions. The court re-emphasized that the wrongful performance of a ministerial act can subject the officer or employee to liability for damages. Moreover, although discretionary functions performed in good faith will not subject a government employee or officer to liability, those performed in bad faith, such as acts that are objectively unreasonable, willful, or performed maliciously with the intent to harm the plaintiff or with a corrupt motive are not shielded by immunity.[3]

If we found it necessary to analyze the immunity status of the individual appellees in the present case, it is clear that *Yanero*, not *Malone*, is the controlling precedent. However, the threshold issues are: (1) whether the Ammons have stated a claim for the wrongful destruction of Hair Bear,

---

1. Ky., 957 S.W.2d 195 (1997).

2. Ky., 65 S.W.3d 510 (2001).

3. *Id.* at 523.

and (2) for outrageous conduct causing severe emotional distress. Since we find that they have not stated a claim, the issue of immunity is moot and a discussion of such issue would be nothing more than *obiter dicta.*

 Although dogs are considered property, the protection afforded them under the law is uniquely limited.[4] The relationship between dogs, humans, and the law was eloquently stated in *Shadoan v. Barnett:*[5]

> [H]istory may be searched in vain to find a living creature exhibiting as much fidelity and affection than does the dog to and for his master. Neither cold, heat, danger, nor starvation deters him from manifesting those most excellent qualities in his love for his master, and those with whom he constantly associates. History is filled with instances where all others have fled, but the faithful dog stood guard, either as a mourner at his master's grave or with a determined purpose to administer to the latter if occasion presented itself. The press dispatches constantly record his unparalleled deeds of heroism for the protection and benefit of mankind, even at the sacrifice of his own life. Because of those qualities, his virtues have been touchingly described by poets and celebrated in song, and rightfully the dog as a companion is most affectionately regarded by all persons who truly estimate loyalty and friendship as factors in smoothing the path of this world's existence. For those reasons, some of the provisions of the statute, whereby the innocent dog forfeits his life because of derelictions of an unappreciative master,

are to be regretted. But, notwithstanding his many virtues, he also has faults, on account of which the law, as we have seen, does not accord to him the full measure of protection extended to other articles of property, leaving his status and the regulations of his existence to be fixed by the Legislature as it in its wisdom sees proper in the lawful exercise of its police power. In other words, because of his sometimes vicious and destructive qualities, he has been regarded and recognized by the law as only qualified property, with the right in the Legislature under the police power to prescribe regulations for his continued existence by either enlarging or abridging those recognized by the common law.

It is undisputed that Hair Bear, an unregistered mixed breed with no particular training or skill other than as a companion, had no market value. Yet, the Ammons urge this court to permit them to prove Hair Bear's value as a beloved and devoted pet.

The affection an owner has for, and receives from, a beloved dog is undeniable. It remains, however, that a dog is property, not a family member. The Ammons request damages for loss of consortium, a common law remedy limited, until recently, to the marital relationship.[6] In *Giuliani v. Guiler,*[7] the court reasoned that it was time for the common law to recognize that the loss suffered by a child as a result of the wrongful death of a parent should be no different from the claim of parents for the loss of a child's consortium recognized in KRS 411.135.[8] The action re-

---

4. *See Duff v. Louisville & Nashville Railroad Company,* 219 Ky. 238, 292 S.W. 814 (1927).

5. 217 Ky. 205, 211, 289 S.W. 204, 206 (1926).

6. *See Angelet v. Shivar,* Ky.App., 602 S.W.2d 185 (1980).

7. Ky., 951 S.W.2d 318 (1997).

8. *Id.* at 321.

mains one, however, dependent on the familial relationship. The loss of love and affection resulting from the loss or destruction of personal property is not compensable.

■ The Ammons allege that the shooting of Hair Bear caused them severe emotional distress. In *Craft v. Rice,*[9] Kentucky adopted from Section 46 of the *Restatement (Second) of Torts* the tort of "Outrageous Conduct Causing Severe Emotional Distress," the elements of which are:

One, the wrongdoer's conduct was intentional or reckless. This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved. Three, there was a causal connection between the wrongdoer's conduct and the emotional distress. Four, the emotional distress was severe.[10]

The actor's conduct must be more than merely offensive.

It has not been enough that the defendant has acted with an intent which is tortious ..., or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,'.... *Liability has been found*

*only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.*[11] (Emphasis original)

In *Burgess v. Taylor,*[12] the court held that the tort depends on the actor's conduct, not on the subject of the conduct. Simply because a claim involves an animal does not preclude a claim for intentional infliction of emotional distress. Here, however, Brewer did not shoot Hair Bear in the presence of the Ammons. As a matter of fact, Brewer had not made positive identification of the dog's owner. There is no evidence that Brewer intended to inflict emotional harm on the Ammon family.

■ Also the claim for punitive damages cannot succeed since the failure to assert a claim on which actual damages can be awarded precludes them from seeking punitive damages.[13]

■ In addition to their damage claim, the Ammons also seek to have this court declare that destruction of impounded dogs by a gunshot to the head is inhumane and, thus, enjoin the Trimble County Dog Warden from using such method. Although KRS 258.215 states that dogs are to be destroyed in a humane manner, it does not provide further directives as to the method of destruction.

We note that in many rural areas of the Commonwealth, dog pounds established by the fiscal court may be little more than wire enclosures that serve as holding pens

9. Ky., 671 S.W.2d 247 (1984).

10. *Id.* at 249.

11. *Humana of Kentucky v. Seitz,* Ky., 796 S.W.2d 1, 3 (1990).

12. Ky.App., 44 S.W.3d 806 (2001).

13. *Lawrence v. Risen,* Ky.App., 598 S.W.2d 474, 476 (1980).

until the dogs are either adopted or destroyed. If the latter is their fate, in many counties it is accomplished by gunshot. In counties such as Trimble County the dog warden has neither the expertise nor the instruments to kill the dogs by methods thought by some to be more humane than shooting them. Although the conditions of these pounds and the method of destroying the dogs may be morally offensive to some, it is the legislature's prerogative, not that of this court, to abolish the practice. Whether dogs should be killed by gunshot is a public policy question to be resolved only by the legislature.[14] We are convinced it is aware of the practice of shooting dogs in many rural areas of the Commonwealth, and since it has not chosen to prohibit it, we conclude that it considers shooting to be a humane method of euthanizing unwanted animals.

The judgment of the Trimble Circuit Court is affirmed.

ALL CONCUR.

14. *Giuliani, supra,* at 321.