## Wolff et al. v. Benovitz.

Dec. 21, 1945.

As Modified on Rehearing Feb. 1, 1946.

Wade & Mapother and H. S. Keeling for appellants.

Alex Berman and L. R. Curtis for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

This ordinary action was filed in the Jefferson circuit court on May 9, 1942, by appellants, and plaintiffs below, Max and Harry Wolff, partners, doing business under the name of Wolff Poultry & Egg Company, against the appellee, and defendant below, L. Benovitz, by which plaintiffs sought to recover damages for slandering their business, which they placed in their petition at $5,100 actual damages and $20,000 punitive damages.

Defendant denied the falsity of the charge made in the petition, as well as the malice charged therein, and then pleaded its truth, and that the words he spoke were to a person and on an occasion that he had a right

to do so, thereby specially privileged. In the reply plaintiffs denied, in general terms, the material averments of the answer, and upon trial the jury under instructions of the court returned a verdict for defendant, followed by judgment dismissing the petition, from which plaintiffs appeal.

All parties to the action are Orthodox Jews, and defendant especially observes the rituals, laws and prescribed canons of the Jewish Church for the preparation of meat food to be eaten by Jews of that faith. He is engaged in a different business within the same block of plaintiffs' located business, and they were not only acquaintances and friends, but were also members of the same synagogue. He frequently patronized plaintiffs in buying from them the products in which they dealt. In the latter part of January, or the early part of February, 1942, he entered their store and bought a chicken, and while plaintiff, Max Wolff, was getting the change in payment of its price defendant observed, from a distance of some 10 or 15 feet toward the rear of the small store room, some person dipping a picked chicken —which he obtained from a stack of others on a table nearby—in steaming hot water after passing the carcass through a flame to remove therefrom the pin feathers. Such act was being done by a servant of plaintiff whose back was toward defendant so that he did not recognize the servant, even if defendant had known him. He did, however, also observe that the chicken had a ring made of some metal that had been placed on its leg by a Schochet duly appointed by the Rabbi, having ecclesiastic jurisdiction throughout the city of Louisville.

The Orthodox Jewish Church has prescribed dietary laws by which flesh foods consumed by Orthodox members are prepared for human consumption and which, under the evidence, is based, as they believe, on the laws of Moses. As applied to fowls it is: The fowl must be slaughtered by a Schochet who removes therefrom the feathers by picking the carcass dry without the application of hot water, after which he places a ring around the leg of the fowl to indicate that it had been so slaughtered and picked by him. It is then carried to the dealer (such as plaintiffs), when the intended purpose is for the fowl to be consumed at a Jewish banquet or other assembly of members of that faith. The ritual

then prescribes that the dealer shall ascertain whether or not the chicken was a healthy one and then places the carcass in cold water for one-half hour. It must then be salted for ''about an hour'' and then washed in *cold* water. But at no stage must the carcass be placed in *hot* or *boiling* water. The banning of the application of hot or boiling water is required in order to prevent the coagulation of the blood, since the outlined process is intended to eliminate from the carcass all of the fowl's blood, which under the Jewish law should not be consumed as food. If not strictly so prepared it is called Trafe by Orthodox Jews, consumable only by Gentiles. The outlined stages and formula is admitted by plaintiffs as a part of the prescribed law of the Jewish Church. Therefore, when defendant saw, while in plaintiffs' place of business, the dipping of the slaughtered and dressed chicken in steaming water, he at once knew that it was in violation of the prescribed law of the Jewish Church, a part of it also being that any member of that faith should report to the Rabbi, if accessible, but if not to a Schochet.

Defendant, according to his testimony, struggled between his duty to his religious faith to make such a report, and his friendship for plaintiffs. The Rabbi was absent from Louisville at that time and remained so until the following Saturday, February 7, 1942, which is the Sabbath Day of the week with Orthodox Jews espousing the Jewish faith. In the meantime, and before the Rabbi returned, defendant did mention the fact to a Schochet within the city and at the meeting held in the forenoon of Saturday, February 7, the latter persuaded defendant to inform the Rabbi—who was then presiding at the meeting—of what he saw as above outlined. The Schochet accompanied defendant from his seat to that of the Rabbi, one B. Notelevitz, who was seated on the platform or pulpit, and defendant at the solicitation of the Schochet made the statement with which he is charged, to the Rabbi.

It was learned by defendant, as well as the Rabbi, that the stack of chickens which defendant saw on the occasion referred to—one of which was handled in the manner indicated by plaintiffs' servant—was being prepared for some kind of Jewish meeting at the Kentucky Hotel, which has a room and supplies especially set apart for such occasions. Upon receiving the information the

Rabbi called on Mr. Friedman, the manager of the Kentucky Hotel, and imparted to him the information that defendant had given him, but nothing of materiality to this action occurred between them. However, the Rabbi called plaintiffs over the phone and requested that they come to his office, the purpose being to investigate the report, but plaintiffs declined to do so. Two other similar efforts were made by the Rabbi which were likewise declined by plaintiffs. In testifying about such notifications by the Rabbi and his request, plaintiff Max Wolff testified:

"A. I thought he ought to come to me.

"Q. You would rather the matter not be straightened out than to go to your Rabbi and talk to him about it? A. Well, when a fellow knocks somebody down without cause they are supposed, and by rights it is their duty to go and pick them up."

After such refusal the Rabbi notified the Schochets throughout the city to not pick chickens for butchering by plaintiffs until the matter was straightened out. In the meantime inquiries were made by the Rabbi, and at the end of five days after issuing such order it was rescinded. During that period plaintiffs themselves did more to scatter and publicize the previous happenings than the combined circulation by all of the persons possessing knowledge of it, which was but a limited few.

Plaintiffs first sued the Rabbi claiming that the circulated report had been made by that religious functionary maliciously and falsely and sought recovery of damages to their business from him. However, that suit was not tried but was stricken from the docket for some reason not shown by the record. Following such abandonment of that action this action was filed against defendant terminating, as we have hereinbefore pointed out.

There are two grounds for affirming the judgment which are, (1) that the alleged slanderous words charged in the petition as having been spoken by defendant were proven to be true, which is always a successful defense to this character of action; and (2) that the right of "Special Privilege" is available under the facts of this case. Defendant testified positively, at

numerous stages of his testimony, that he actually saw what plaintiffs' servant did to the chicken which had been slaughtered by the Schochet in preparation of Kosher food. That testimony was denied by no one, except plaintiffs endeavored to prove that defendant was not located in their store room at a place where he could see what occurred and to which he testified. But such description of locations and obstructions are but vaguely made and by no means convincing. Furthermore, plaintiffs neither produced the guilty servant nor explained why they so failed, notwithstanding his importance as a witness on that crucial issue of fact. Its truth, therefore, stands virtually admitted.

Defense (1) is so thoroughly established and deeply rooted in the law as to require no discussion or citation of cases and authorities supporting it. We will, therefore, confine our discussion to defense (2).

The text in 33 Amer. Jur., page 124, section 126, says in part: "A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege would be actionable, and although his duty is not a legal one, but only a moral or social duty of imperfect obligation. * * * The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within any narrow limits."

Cases in the notes to that text are cited from some twenty states of this Union and from the Supreme Court of the United States, Canada and England, including, of course, this court. Two of the latest domestic cases from this court are: Baker v. Clark, 186 Ky. 816, 218 S. W. 280, and Weinstein v. Rhorer, 240 Ky. 679, 42 S. W. 2d 892. In the same volume of Amer. Jur., page 131, section 132, the text says: "It seems to be generally recognized that a qualified privilege attaches to statements and communications made in connection with the various activities of such organizations as lodges, societies, labor unions, etc. Thus it is well settled that members of such bodies may report on the qualifications of applicants, prefer charges against fellow members,

offer testimony in support of the charges, and make proper publication of any disciplinary action that may be taken, without liability for any resultant defamation, so long as they act without malice. * * *''

That text is also supported by abundant authorities cited in the notes thereto. Also on page 132, section 133 of the same volume speaking with reference to ''Church Matters,'' the text says: ''While it seems that no privilege attaches to defamatory statements made by a clergyman from his pulpit, a different rule governs communications between church members and authorities in respect of organizational and administrative matters; and the courts appear to agree that in the absence of malice, members may discuss the character of their pastor, communicate rumors of misconduct to each other, and prefer charges whenever there appears to be any foundation therefor. * * *''.

That text is also supported by like citations in the notes. In addition to the text and cases to which we have referred, there is listed in Volume 3, beginning on page 2695, and in Volume 6 beginning on page 2202, of Caldwell's Kentucky Judicial Dictionary a long list of domestic cases in complete accord with the cited text from American Jurisprudence with reference to the defense of qualified privilege in actions for slander and libel, in which list are the two domestic cases above referred to, with a great number of additional ones. They all approve the universally accepted rule that when the alleged slander is spoken under the conditions outlined the defendant (utterer) is shielded by the thoroughly adjudged principle, and the words do not become actionable—some of the cases going so far as to apply the rule even when malice is shown, the burden being upon plaintiff to establish it. However, it is not necessary for us to approve or disapprove of the latter ruling in such cases when express malice appears, since in this case there is a total want of any malice on the part of defendant. He reluctantly made the report to his Rabbi, which, as we have seen, was his duty to do in obeying the precepts and doctrine of his Church.

It would, therefore, appear to have been the duty of the court to have sustained defendant's motion for a peremptory instruction in his favor. Instead it submitted the issues in what we conclude were appropriate

instructions to the jury, (conceding a submittable case was developed) and it promptly returned the verdict in favor of defendant. Having arrived at such conclusion it becomes unnecessary to even refer to, much less discuss, other questions argued in brief by counsel for appellants.

Wherefore, for the reasons stated, the judgment is affirmed.