**Virginia STRINGER, Reual E. Angel, Donnie H. Brummett, and Tina M. Sparks Appellants,**

**v.**

**WAL–MART STORES, INC., and Anthony Whitaker Appellees.**

**No. 2001–SC–0262–DG.**

Supreme Court of Kentucky.

Oct. 21, 2004.

Rehearing Denied Jan. 20, 2005.

---

2. KRS 311.530–311.620.

Thomas E. Carroll, Carroll Law Offices, Monticello, David Lewis Williams, Burkesville, Jennifer Jordan Hall, Louisville, Counsel for Appellants.

Richard H.C. Clay, Elizabeth U. Mendel, Donna King Perry, Woodward, Hobson & Fulton, Robert I. Cusick, Jr., Virginia Hamilton Snell, Deborah H. Patterson, Wyatt, Tarrant & Combs, Louisville, Counsel for Appellees.

Robert M. Watt, III, Amy Claire Johnson, Stoll, Keenon & Park, LLP, Lexington, Counsel for Amicus Curiae, the Kentucky Chamber of Commerce.

Opinion of the Court by Justice KELLER.

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

In June and July, 1995, Appellants, who were employees of a Monticello, Kentucky Wal–Mart, Inc. ("Wal–Mart") store, were terminated for "unauthorized removal of company property" and "violation of company policy"—specifically, for eating "claims candy," i.e., candy from open or torn bags removed from the store's shelves that had been taken to the store's "claims area" to be processed by a claims clerk and then either discarded or returned. Appellants filed suit against Wal–Mart and their supervisor, Appellee Anthony Whitaker ("Whitaker") contending that, before, during, and after their termination, Wal–Mart committed the tortious acts of (1) intentional infliction of emotional distress (IIED)/outrage, by engaging in illegal surveillance of Appellants and conducting accusatory termination interviews; (2) defamation, through written and oral accusations to, and in the presence of, third parties to the effect that Appellants had been discharged for theft; and (3) an invasion of Appellant's privacy through violations of the provisions of KRS Chapter 526, which criminalizes conduct relating to eavesdropping.

A jury returned a verdict in Appellants' favor on each of their claims. In accordance with the jury's verdict, the Wayne Circuit Court entered judgment awarding each Appellant $2,000,000.00 in compensatory damages—$1,000,000.00 for "injury to reputation" and $1,000,000.00 for "embarrassment, humiliation, and mental anguish"—and $3,000,000.00 in punitive damages. Appellant Virginia Stringer ("Stringer") was awarded an additional $20,000.00 for her lost wages.

The Court of Appeals held that the trial court erred by failing to direct a verdict in Appellees' favor as to each of Appellants' claims and reversed the trial court's judgment in its entirety. We granted discretionary review and now affirm the Court of Appeals's holding with respect to the IIED/outrage claim and the invasion-of-privacy/eavesdropping claim, but reverse its holding as to Appellants' claim for defamation because the evidence at trial was sufficient to submit that claim to the jury. Because the jury's compensatory and punitive damages verdicts do not segregate the damages awarded for each claim, we vacate the previous damage awards and remand the case for the trial court to conduct a retrial solely to determine appropri-

ate damages for Appellants' defamation claim.

## II. ANALYSIS

### A. STANDARD OF REVIEW

 Appellate review of a trial court's denial of a motion for directed verdict is limited to a determination of whether the jury's verdict was palpably or flagrantly contrary to the evidence presented at trial:

> Upon review of the evidence supporting a judgment entered upon a jury verdict, the role of an appellate court is limited to determining whether the trial court erred in failing to grant the motion for directed verdict. All evidence which favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence, these being functions reserved to the trier of fact. The prevailing party is entitled to all reasonable inferences which may be drawn from the evidence. *Upon completion of such an evidentiary review, the appellate court must determine whether the verdict rendered is " 'palpably or flagrantly' against the evidence so as 'to indicate that it was reached as a result of passion or prejudice.' " If the reviewing court concludes that such is the case, it is at liberty to reverse the judgment on the grounds that the trial court erred in failing to [grant] the motion for directed verdict. Otherwise, the judgment must be affirmed.*[1]

Accordingly, we review the sufficiency of the evidence with respect to each of Appellant's three (3) claims under this standard.

### B. IIED / OUTRAGEOUS CONDUCT

 Count I of Appellants' complaint stated a claim for IIED/outrage. Paragraphs 1–17 detailed Appellants' "conspiracy theory," *i.e.,* Appellants' claim that store policy actually permitted the consumption of claims candy and that the store's manager, Whitaker, installed the video equipment in order to fabricate a pretense for terminating Appellants when his actual motive was to prevent his own demotion by reducing payroll expenses and demonstrating a "get tough on inventory shrinkage" stance. The remainder of Count I alleged:

> 18. That at the time of the discharge of the plaintiffs, they were told that they could not leave the store after having worked the entire night. The[y] were brought in one at a time and were abruptly told by Anthony Whitaker and Lee Scholenberger that they were being fired for "stealing" and that they had videotaped them. The plaintiff, Donnie H. Brummett, was told to make it easy on himself and admit to stealing stereos and electric razors. The plaintiff, Virginia Stringer, was questioned about missing items in the claims area such as fishing rods. The plaintiffs, during their discharge, were treated by the defendants and their representative as criminals (thieves). In fact, the plaintiff, Donnie H. Brummett, was told that if he did not sue them they would not press criminal charges.
>
> 19. That the actions of the defendant, Anthony Whitaker, with the acquiescence and approval of the defendant, Wal Mart, were malicious, outrageous, intentional, and/or such a wanton

1. *Lewis v. Bledsoe Surface Min. Co.,* Ky., 798 S.W.2d 459, 461–62 (1990) (citations omitted and emphasis added). *See also Bierman v. Klapheke,* Ky., 967 S.W.2d 16, 18–19 (1998);

*Kroger Co. v. Willgruber,* Ky., 920 S.W.2d 61, 64 (1996); *National Coll. Athletic Ass'n v. Hornung,* Ky., 754 S.W.2d 855, 860 (1988).

course of conduct such [sic] it was their intent to cause the plaintiffs sever[e] emotional distress, or that their conduct was such that the defendants, knew, or should have known, that their conduct would cause or be likely to cause severe emotional distress.

20. That each of the plaintiffs have suffered severe emotional distress, consisting of fright, shame, humiliation, apprehension, and anxiety, as the direct and proximate result of the defendant's aforementioned conduct and are entitled to recover from the defendants, jointly and severally, both compensatory and punitive damages in excess of the jurisdictional limits of this Court.

At trial, however, Appellants argued that Appellees' outrageous conduct consisted of more than the set-up, surveillance, and accusatory exit interviews. And, on appeal, Appellants advocate that the jury's verdict was supported by evidence demonstrating that Appellees: (1) escorted three of the four Appellants out of the store following their termination; (2) implied to other employees that Appellants were thieves (an assertion that is facially duplicative of Appellants' defamation claim); (3) attempted to deny Appellants their unemployment benefits; and (4) used the surveillance tape to train employees.

■ In *Craft v. Rice*,[2] this Court adopted Restatement (Second) of Torts § 46(1), which provides:

One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.[3]

A prima facie case of IIED/outrage requires that:

1) the wrongdoer's conduct must be intentional or reckless;

2) the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality;

3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and

4) the emotional distress must be severe.[4]

■ In opinions interpreting the scope of this cause of action, which has been likened to a criminal action for harassment,[5] Kentucky appellate courts have observed that "not every upset plaintiff can recover for emotional distress"[6] and that "not every bad act gives rise to a cause of action for the intentional infliction of emotional distress[.]"[7] Of course, it is "the conduct of the offender rather than the subject of the conduct [that] determines whether the conduct was outrageous."[8] Because "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to

2. Ky., 671 S.W.2d 247 (1984).

3. RESTATEMENT (SECOND) OF TORTS § 46(1) (1965).

4. *Humana of Kentucky, Inc. v. Seitz*, Ky., 796 S.W.2d 1, 2–3 (1990). *See also Osborne v. Payne*, Ky., 31 S.W.3d 911, 913–14 (2000).

5. *Zurich Ins. Co. v. Mitchell*, Ky., 712 S.W.2d 340, 343 (1986).

6. *First and Farmer's Bank of Somerset, Inc. v. Henderson*, Ky.App., 763 S.W.2d 137, 143 (1988).

7. *Id.*

8. *Burgess v. Taylor*, Ky.App., 44 S.W.3d 806, 809 (2001).

permit recovery," [9] Kentucky courts have turned to the commentary to § 46 for guidance in assessing whether conduct is actionably extreme and outrageous:

> *Extreme and outrageous conduct.* The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
>
> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime, plaintiffs will necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no reason for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam .... [10]

With these goalposts in mind, Kentucky courts have found plaintiffs' proof of outrageous conduct sufficient to support an outrage/IIED claim in cases where the defendants: (1) harassed the plaintiff "by keeping her under surveillance at work and home, telling her over the CB radio that he would put her husband in jail and driving so as to force her vehicle into an opposing lane of traffic"; [11] (2) intentionally failed to warn the plaintiff for a period of five months that defendant's building, in which plaintiff was engaged in the removal of pipes and ducts, contained asbestos; [12] (3) engaged in "a plan of attempted fraud, deceit, slander, and interference with contractual rights, all carefully orchestrated

---

**9.** RESTATEMENT (SECOND) OF TORTS § 46(1) cmt. h (1965). *See also Whittington v. Whittington,* Ky.App., 766 S.W.2d 73, 74 (1989). *Cf. Wilson v. Lowe's Home Center,* Ky.App., 75 S.W.3d 229, 238 (2001) (referencing cmt. h in case where the evidence presented a jury question).

**10.** RESTATEMENT (SECOND) OF TORTS § 46(1) cmt. d (1965). *See also Kroger Company v. Willgruber,* Ky., 920 S.W.2d 61, 65 (1996) ("Citizens in our society are expected to withstand petty insults, unkind words and minor indignities. Such irritations are a part of normal, every day life and constitute no legal cause of action."); *Seitz,* 796 S.W.2d at

3; *Burgess,* 44 S.W.3d at 811; *Brewer v. Hillard,* Ky.App., 15 S.W.3d 1, 7 (1999); *Capital Holding Corp. v. Bailey,* Ky., 873 S.W.2d 187, 196 (1994); *Bednarek v. Local Union 227,* Ky.App., 780 S.W.2d 630, 632 (1989); *Wilhoite v. Cobb,* Ky.App., 761 S.W.2d 625, 627 (1988).

**11.** *Craft,* 671 S.W.2d at 248. *See also id.* at 250 ("The conduct alleged here is a deviation from all reasonable bounds of decency and is utterly intolerable in a civilized community. It qualifies as harassment intended to cause extreme emotional distress.").

**12.** *Bailey,* 873 S.W.2d at 196.

in an attempt to bring [plaintiff] to his knees";[13] (4) committed same-sex sexual harassment in the form of "frequent incidents of lewd name calling coupled with multiple unsolicited and unwanted requests for homosexual sex";[14] (5) was a Catholic priest who "used his relationship [as marriage counselor for] the [plaintiff] husband and the wife to obtain a sexual affair with the wife";[15] (6) agreed to care for plaintiff's long-time companion-animals, two registered Appaloosa horses, and then immediately sold them for slaughter;[16] and (7) subjected plaintiff to nearly daily racial indignities for approximately seven years.[17]

Outrageousness has been found lacking, however, in less-egregious cases where the defendant: (1) refused to pay medical expenses arising out of an injured worker's compensation claim;[18] (2) wrongfully converted the plaintiff's property in a manner that breached the peace;[19] (3) negligently allowed his vehicle to leave the road and struck and killed a child;[20] (4) committed "reprehensible" fraud during divorce proceedings by converting funds belonging to his spouse for the benefit of defendant and his adulterous partner;[21] (5) wrongfully terminated the plaintiff;[22] (6) displayed a lack of compassion, patience, and taste by ordering plaintiff, who was hysterical over the fact that she had just delivered a stillborn child in her hospital room, to "shut up" and then informing her that the stillborn child would be "disposed of" in the hospital;[23] (7) erected a billboard referencing defendant's status as a convicted

13. *Willgruber*, 920 S.W.2d at 64–67.

14. *Brewer*, 15 S.W.3d at 7. *Id.* at 6 ("As to whether Brewer's conduct was outrageous and intolerable to the point of being actionable ... we have no trouble finding that it is.").

15. *Osborne v. Payne*, Ky., 31 S.W.3d at 913.

16. *Burgess*, 44 S.W.3d at 809–12. *Id.* at 812 ("This Court cannot characterize this emotional torment inflicted by the Burgesses as anything other than heartless, flagrant, and outrageous." (internal quotation marks omitted)).

17. *Wilson*, 75 S.W.3d at 238 ("If Wilson's allegations are true, then he was subjected to racial remarks on nearly a daily basis by his coworkers and supervisors for a period of nearly seven years. If such conduct occurred, we believe a jury could find such conduct to be intentional, outrageous, and intolerable.").

18. *Mitchell*, 712 S.W.2d at 341 ("The delay in the payment of medical bills demonstrated in this case cannot be the basis for an action for outrageous conduct pursuant to *Craft v. Rice*."); *General Acc. Ins. Co. v. Blank*, Ky. App., 873 S.W.2d 580, 582 (1993) ("*Craft* is distinguishable from a situation involving a mere termination or delay of payments owned under a contract or a judgment which were being processed through judicial or administrative channels. Certainly, GA had just cause to question the necessity of back surgery, and its conduct simply did not rise to a level of extreme or outrageous conduct.").

19. *Henderson*, 763 S.W.2d at 143.

20. *Wilhoite*, 761 S.W.2d at 627 ("[T]here is no evidence in the record that the appellee's conduct was extreme and outrageous, although the result was certainly horrendous.").

21. *Whittington*, 766 S.W.2d at 73–74. *Id.* at 74 ("While we cannot condone or excuse Mr. Whittington's reprehensible actions, we do not see them as rising to the level of outrageousness necessary for tortious liability.").

22. *Bednarek*, 780 S.W.2d at 632 ("The conduct of Kroger or the Union as alleged in the complaint, and shown by the evidence in the record, does not reach that standard [of outrageousness.]").

23. *Seitz*, 796 S.W.2d at 2. *Id.* at 4 ("The evidence relied on shows, at worst, a lack of compassion and lack of taste, but certainly does not comport with the criteria in *Craft* and in the Restatement § 46.").

child molester;[24] (8) wrongfully garnished plaintiff's wages pursuant to a forged agreement;[25] and (9) impregnated plaintiff's wife.[26] Courts have found other elements of the prima facie case missing, or have otherwise found recovery pursuant to § 46 unavailable, in cases where the defendant: (1) a Catholic priest, sexually abused a ten-year-old boy;[27] (2) breached a promise to marry;[28] (3) chained a high school student to a tree by his ankle and neck;[29] and (4) shot and killed a beloved family pet, which had been misidentified as a stray dog.[30]

■■■ After examining the evidence in a light most favorable to Appellants, we agree with the Court of Appeals that the trial court erred when it denied Appellees' motion for a directed verdict. We have set a high threshold for IIED/outrage claims, i.e., that the conduct at issue must be "a deviation from all reasonable bounds of decency and is utterly intolerable in a civilized community,"[31] and, when measured against this standard, the jury's verdict in this case was flagrantly against the evidence. Appellants were at-will employees, and Wal–Mart could terminate their employment at any time "for good cause, for no cause, or for a cause that some might view as morally indefensible."[32] Accordingly, the "heart" of Appellant's IIED/outrage claim, i.e., that Whitaker manufactured an excuse to fire them in order to save his own job, falls short of the extreme and outrageous conduct necessary to support such a claim. Although we recognized in Willgruber that an employer's conduct in connection with the termination of an employee can constitute outrageous conduct, Appellees' actions in this case do not approach those found actionable as IIED/outrage in Willgruber. We stress that "major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is

24. *Allen v. Clemons*, Ky.App., 920 S.W.2d 884 (1996).

25. *Kentucky Farm Bureau Mutual Ins. Co. v. Burton*, Ky.App., 922 S.W.2d 385 (1996) ("[W]e do not believe that [plaintiff] has shown that Farm Bureau's actions constituted outrageous conduct . . . . While the manner in which the proceedings were handled—from beginning to end—undoubtedly reflects ineptitude and indifference, we simply cannot agree that it rose to the level of intentional infliction of severe emotional distress according to the directives set forth under governing case law.").

26. *Arlinghaus v. Gallenstein*, Ky.App., 115 S.W.3d 351 (2003).

27. *Rigazio v. Archdiocese of Louisville*, Ky. App., 853 S.W.2d 295 (1993) (holding that plaintiff could not recover for IIED/outrage because he could recover for emotional distress as an element of damages for common law assault or battery, and *"[t]he tort of outrage was intended to supplement the existing forms of recovery, not swallow them up."* (citation omitted and emphasis added)).

28. *Gilbert v. Barkes*, Ky., 987 S.W.2d 772, 777 (1999) (stating merely that "it is clear that Ms. Barkes has not alleged facts which could even begin to support a claim for IIED.").

29. *Banks v. Fritsch*, Ky.App., 39 S.W.3d 474 (2001) (holding that directed verdict for defendant on IIED/outrage claim was proper where evidence did not support a finding that defendant intended only to cause plaintiff extreme emotional disturbance, and plaintiff may be able to recover emotional damages arising from false imprisonment, assault, or battery).

30. *Ammon v. Welty*, Ky.App., 113 S.W.3d 185, 188 (2002) (holding that "[t]here is no evidence that Brewer intended to inflict emotional harm on the Ammon family.")

31. *Craft*, 671 S.W.2d at 250.

32. *Firestone Textile Co. v. Meadows*, Ky., 666 S.W.2d 730, 731 (1983).

not enough."[33] The "indignities" associated with Appellees' escort of Appellants from the store premises and the other conduct identified at trial did not present a jury question as to IIED/outrage in this case. We thus affirm the Court of Appeals's holding that reversed the judgment for this claim in favor of Appellants.

## C. DEFAMATION

▮▮▮ Count II of Appellants' Complaint alleged:

2. That following the discharge of the plaintiffs, the defendant, Wal Mart, by and through it's [sic] management team at the Monticello Wal Mart, and the defendant, Anthony Whitaker, made false and defamatory statements to persons other than the plaintiffs, that would lead a reasonable person to believe that the plaintiffs were involved in stealing property from Wal Mart.

3. That the statements by the defendants were false and are defamatory per se.

4. That as a direct and proximate result of the defamatory statements made by the defendants, the plaintiffs have suffered:

 a. Injury to their reputation in the community;

 b. Mental anguish and injury to their feelings;

 c. Loss of income proximately resulting from the defamatory statements;

 d. Injury to credit proximately resulting from the defamatory statements;

 e. Losses and injuries reasonably certain to be sustained in the future.

5. That the defamatory statements of the defendants were intentional, with malice or with reckless disregard as whether they were false or not, thus the plaintiffs are entitled to punitive damages.

At trial, Appellants introduced evidence concerning five separate allegedly defamatory oral or written statements made by Appellees: (1) oral statements made by Whitaker at a store-wide meeting he conducted in a public area of the store within a few weeks of Appellants' firing that were "more or less that some associates had been fired for stealing," that indicated that theft would not be tolerated at the store and "it didn't matter whether it was an associate or customers," and that "left the impression that there was more to it ... than just claims candy;" (2) an oral statement from James Carey, a Wal–Mart Assistant Manager, who, when asked whether Appellants had been terminated for eating candy from the claims area, responded " '[t]here was more to it than that' and that he couldn't talk about it" while in the employee lounge and in the presence of at least three employees; (3) a written document completed by Whitaker at the termination interview specifying that each employee had been terminated from employment because of "unauthorized removal of company property," that was forwarded to the store's personnel office and its contents were entered into the corporate computer system; (4) an oral statement made by Wal–Mart personnel at a district-wide meeting of Wal–Mart management to the effect that "[w]e had four people fired for stealing out of receiving [or for an integrity issue." — "the witness was equivocal regarding the exact phrasing]. I'm not going to tell you who it is or what store it is"; and (5) Whitaker's forwarding of the exit interview

---

**33.** RESTATEMENT (SECOND) OF TORTS § 46(1) cmt. f (1965).

documents, which indicated the reason for termination as "unauthorized removal of company property," to Frankfort in connection with his decision to contest Appellants' unemployment claims.

Although constitutional protections for free speech and freedom of the press require heightened proof requirements and other modifications to the common law of defamation in certain situations, the case at bar, which involves allegedly defamatory statements of a purely private concern about private persons, do not implicate those constitutional protections. We thus measure the sufficiency of Appellants' defamation claims against the elements of prima facie cases of common law libel and slander and the defenses relied upon by Appellees.

▆▆▆ "Defamation by writing and by contemporary means analogous to writing . . . is libel. Defamation communicated orally is slander."[34] Generally-speaking, however, the "gist" of both torts is "the injury to the reputation of a person in public esteem"[35] and thus prima facie cases for both torts require proof of:

1. defamatory language
2. about the plaintiff
3. which is published and
4. which causes injury to reputation.[36]

The first three elements of the prima facie case are relatively easy to comprehend. "Defamatory language" is broadly construed as language that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."[37] And, "[i]t is for the jury to determine, on the basis of competent evidence, whether a defamatory meaning was attributed to it by those who received the communication. The terms should be construed in their most natural meaning and should be 'measured by the natural and probable effect on the mind of the average reader.'"[38] Element two, "about the plaintiff" largely speaks for it-

---

34. 2 DAN B. DOBBS, THE LAW OF TORTS, § 401 at 1120 (2001). *See also McCall v. Courier–Journal & Louisville Times Co.,* Ky., 623 S.W.2d 882, 884.

35. *Fordson Coal Co. v. Carter,* 269 Ky. 805, 108 S.W.2d 1007, 1008 (1937).

36. *Columbia Sussex Corp., Inc. v. Hay,* Ky. App., 627 S.W.2d 270, 273 (1981).

37. RESTATEMENT (SECOND) OF TORTS § 559 (1977). *See also Ball v. E.W. Scripps Co.,* Ky., 801 S.W.2d 684, 688 (1990) (applying § 559); *McCall,* 623 S.W.2d at 884 ("[A] writing is defamatory if it tends to (1) bring a person into public hatred, contempt or ridicule; (2) cause him to be shunned or avoided; or (3) injure him in his business or occupation.").

38. *Yancey v. Hamilton,* Ky., 786 S.W.2d 854, 858 (1989) (quoting *McCall,* 623 S.W.2d at 884). *See also Digest Pub. Co. v. Perry Pub. Co.,* Ky., 284 S.W.2d 832, 834 (1955) ("The objectionable words must be construed in their most natural meaning and in the sense in which they would be understood by those to whom they were addressed. Such words must be measured by the natural and probable effect on the mind of the average lay reader rather than subjected to the critical analysis of the legal mind."); *Abbott v. Vinson,* 230 Ky. 786, 20 S.W.2d 995, 996 (1929) ("[W]ords falsely spoken will be defined according to their popular meaning, and as intended to be meant by the speaker and understood by the hearers. And, in arriving at the sense in which the defamatory language is employed, it is proper to consider the circumstances surrounding its publication and the entire language used." (citations omitted)); *Commercial Tribune Pub. Co. v. Haines,* 228 Ky. 483, 15 S.W.2d 306, 307 (1929) ("It is a fundamental principle in the law of libel and slander that the defamatory matter complained of should be construed as a whole, and that the language employed therein should receive its common and ordinary acceptation in the light of the conditions and circumstances under which it was published.").

self, but it is worth noting that the plaintiff need not be specifically identified in the defamatory matter itself so long as it was so reasonably understood by plaintiff's "friends and acquaintances ... familiar with the incident."[39] The notion of "publication" is a term of art, and defamatory language is "published" when it is intentionally or negligently communicated to someone other than the party defamed.[40]

Because the proof necessary to demonstrate an injury to reputation varies depending upon the characterization of the defamatory language as one of four at-largely-anachronistic[41] types of statements—libel per se, libel per quod, slander per se, and slander per quod—the final element of the prima facie case, "which causes injury to reputation," requires some additional explanation First, however, a working knowledge of the significance of the distinction between the per se and per quod labels is helpful to an understanding of the labels themselves.

Generally, defamatory words written or spoken of another are divided into two classes in determining the extent to which they are actionable. Words may be actionable per se, or per quod. In the former class, damages are presumed and the person defamed may recover without allegation or proof of special damages. In the latter class, recovery may be sustained only upon an allegation and proof of special damages....[42] In other words, "[w]ords are said to be actionable per se when there is a conclusive presumption of both malice and damage[,]"[43] and, thus, when the defamatory language at issue is determined to be libelous or slanderous per se, recovery is permitted without proof of special damages because injury to reputation is presumed and the words are "actionable on their face—without proof of extrinsic facts or explicatory circumstances."[44] Defamatory statements that are merely libelous or slanderous per quod, however, require "proof of extrinsic facts or explanatory circumstances and special damages."[45]

In comparison to slanderous per se oral statements, which must contain

**39.** *E.W. Scripps Co. v. Cholmondelay*, Ky.App., 569 S.W.2d 700, 702 (1978).

**40.** RESTATEMENT (SECOND) OF TORTS § 577 (1977).

**41.** DAVID A. ELDER, KENTUCKY TORT LAW: DEFAMATION AND THE RIGHT OF PRIVACY, § 1.07(A) at 40 (1983) [hereinafter ELDER] (referencing "the anomalous and anachronistic nature of the common law distinctions between libel and slander" (footnote omitted)).

**42.** *Hill v. Evans*, Ky., 258 S.W.2d 917, 918 (1953). *See also Digest Pub. Co.*, 284 S.W.2d at 834 ("The rule is that actionable words are divided into two classes: (a) those actionable per se which necessarily damage plaintiff; and (b) those which are actionable in consequence of extrinsic facts showing the circumstances under which they were written or spoken and the damages resulting therefrom."); *Elkins v. Roberts*, Ky., 242 S.W.2d 994, 995 (1951) ("[T]here are two classes of actionable words: those slanderous per se, which are presumed by law actually and necessarily to damage the person about whom they are spoken, and those classified as actionable per quod, which on their face are not actionable per se but only in consequence of extrinsic facts show the damages which resulted to the slandered party.").

**43.** *Walker v. Tucker*, 220 Ky. 363, 295 S.W. 138, 139 (1927). *See also Shields v. Booles*, 238 Ky. 673, 38 S.W.2d 677, 680 (1931) ("[W]hen the words are slanderous or libelous per se, general damages are presumed to have accrued from the wrong done and need not be averred."); *Ray v. Shemwell*, 186 Ky. 442, 217 S.W. 351, 353 (1919) ("If the word or words charged are actionable per se, the law presumes malice, and punitive damages may be recovered.").

**44.** ELDER, *supra* note 41, § 1.06 at 37.

**45.** *Id.*

defamatory language of a specific nature, the common law treats a broader class of written defamatory statements as actionable per se: "[w]hile spoken words are slanderous per se only if they impute crime, infectious disease, or unfitness to perform duties of office, or tend to disinherit him, written or printed publications, which are false and tend to injure one in his reputation or to expose him to public hatred, contempt, scorn, obloquy, or shame, are libelous per se."[46] All other defamatory statements are merely libelous or slanderous per quod, and special damages, *i.e.*, actual injury to reputation, must be affirmatively proved if a comprehension of the defamatory nature of the written or spoken words requires extrinsic evidence of context or circumstances.[47] We need not belabor this discussion further, however, because a "[f]alse accusation of theft is actionable per se—that is, libelous or slanderous per se."[48] Accordingly, Appellants were not required to provide affirmative proof of injury to their reputations in order to recover for the defamatory statements at issue in this case:

> Undoubtedly, the most common type of slander action in the recorded Kentucky decisions involves imputation of some form of larceny or related proprietary offense. Although there is limited early dicta to the contrary, *it is now well-settled that no "particular act or transaction" sufficient for indictment is required, as long as the "general terms" "clearly and unequivocally" impute a "high crime, such as* murder, *robbery, or theft."* Consequently, it has been held slanderous per se to impute any of the following forms of felonious misappropriation to the plaintiff: "(God-damned) thief;" "thief;" "nothing but a thief;" "thieving old daddy-in-law;" "has been stealing from" a third person and "has stolen money from me;" "has stolen all over the country;" "he stole;" "(y)ou may call that what you please, stealing or taking;" "did steal from me;" "I discharged [plaintiff] for stealing;" "he follows stealing everything he can get his hands on;" that he "stole and carried away everything (third party) had;" defendant "believed" plaintiff "stole my meat and flour;" "stole hogs" or "hog stealing;" he "stole the check back from me and took it away . . . . If he don't pay the money back I am going to prosecute him in three cases—forgery, obtaining money by false pretenses, and for stealing the check;" burglary of a store house; inside participation in robbery of a motel; marking unbranded cattle with felonious intent; changing of "some coal loaders" checks from other miners' cars and putting his checks on said cars; and he [defendant] had "caught him at it." *Such words, whether general or specific, are actionable per se regardless of the amount of money involved.*[49]

We find that Appellants thus demonstrated a prima facie case for common law defamation per se.

███ To determine whether the evidence was sufficient to support the jury's verdict for Appellants, however, we must also address Appellees' defenses. First, it is beyond dispute that "[i]n this state, truth is a complete defense[,]"[50] and thus a

46. *Courier Journal Co. v. Noble*, 251 Ky. 527, 65 S.W.2d 703, 703 (1933). *See also Shields*, 38 S.W.2d at 681.

47. *Cholmondelay*, 569 S.W.2d at 702.

48. 50 AM. JUR. 2D *Libel and Slander* § 185 at 465 (1995).

49. ELDER, *supra* note 41 at § 1.07(C)(1)(b) at 68.

50. *Bell v. Courier–Journal and Louisville Times Co.*, Ky., 402 S.W.2d 84, 87 (1966). *See also Pennington v. Little*, 266 Ky. 750, 99 S.W.2d 776, 778 (1936); *Buchholtz v. Dugan*,

defendant able to prove the truth of the defamatory statement at issue cannot be held liable for defamation:

> Since the "law will not presume misconduct of a person," the falsity of defamatory words is presumed. Consequently, the defendant has the burden of proving truth as an affirmative defense or "justification" by a preponderance of the evidence. If the defendant fulfills this burden, he has a complete defense to a civil action in defamation, a doctrine "so thoroughly established and deeply rooted" as to lead one modern Kentucky decision to conclude that citation of authority was unnecessary. . . . [T]he modern Kentucky rule is that truth remains an absolute defense even though "the publication may have been inspired by malice or ill will." [51]

Accordingly, "if the evidence supports, without contradiction or room for reasonable difference of opinion, the defense that these [statements] were substantially true, it would necessarily follow that the jury should have been directed to find a verdict for the defendant, because the truth is always a complete defense." [52]

■ Second, although the prima facie case for common law defamation presumes malice, and therefore does not require the plaintiff to make an affirmative showing of it, we have determined that strict liability of that sort is inappropriate in circumstances where the publisher, a third person, or the public has a cognizable interest in communicating the defamatory information. Accordingly, we have recognized a series of qualified or conditional privileges, including "where 'the communication is one in which the party has an interest and it is made to another having a corresponding interest, the communication is privileged if made in good faith and without actual malice.' " [53] "The determination of the existence of privilege is a matter of law," [54] and because of the common interests implicated in the employment context, Kentucky courts have recognized a qualified privilege for defamatory statements relating to the conduct of employees.[55]

---

Ky.App., 977 S.W.2d 24, 27 (1998) ("In Kentucky, truth is a complete defense for libel, even if the statements are libelous *per se.*" (citing *Bell* ));

51. ELDER, *supra* note 41 at § 1.10(A) at 133–35.

52. *Herald Pub. Co. v. Feltner*, 158 Ky. 35, 164 S.W. 370, 372 (1914).

53. *Baker v. Clark*, 186 Ky. 816, 218 S.W. 280, 285 (1920). *See also Baskett v. Crossfield*, 190 Ky. 751, 228 S.W. 673, 675 (1921) ("Where a party makes a communication and such a communication is prompted by a duty owed either to the public or to a third party, or the communication is one in which the party has an interest and is made to another having a corresponding interest, the communication is privileged if made in good faith.").

54. *Columbia Sussex*, 627 S.W.2d at 276. *See also Baker*, 218 S.W. at 285 (1920) ("Whether the occasion of the defamatory publication is or not privileged is usually a question of law to be determined by the court.").

55. *See Dossett v. New York Mining and Manufacturing Co.*, Ky., 451 S.W.2d 843, 846 (1970) (recognizing a privilege for "discussions and communications *within the company* which are necessary to its proper function and the enforcement of the law"); *Wolff v. Benovitz*, 301 Ky. 661, 192 S.W.2d 730, 733 (1945) (" 'It seems to be generally recognized that a qualified privilege attaches to statements and communications made in connection with the various activities of such organizations as lodges, societies, labor unions, etc. Thus, it is well settled that members of such bodies may report on the qualifications of applicants, prefer charges against fellow members, offer testimony in support of the charges, and make proper publication of any disciplinary action that may be taken, without liability for any resultant defamation, so long as they act without malice.' " (quoting former version of AM. JUR.)); *Wyant v. SCM Corp.*, Ky.App., 692 S.W.2d 814, 816 (1985) ("[T]he

Qualified privileges exist where the circumstances "preclude any presumptions of malice, but still leave the party responsible for both falsehood and malice if affirmatively shown."[56] When a qualified privilege is established, the presumption of malice disappears,[57] and thus "false and defamatory statements will not give rise to a cause of action unless maliciously uttered."[58] Stated otherwise, "[i]f a communication come[s] within the class denominated ... qualifiedly privileged, no recovery can be had."[59] However, the key word is "qualified," and the privilege can be lost if abused or exceeded:

> The condition attached to all such qualified privileges is that they must be exercised *in a reasonable manner and for a proper purpose.* The immunity is forfeited if the defendant steps outside the scope of the privilege, or abuses the occasion. The qualified privilege does not extend ... to the publication of ir-

relevant defamatory matter with no bearing upon the public or private interest which is entitled to protection.[60]

In effect, the existence of a qualified privilege merely places a "technical burden of proof" regarding malice upon the plaintiff:

> The significance of the defense of qualified or conditional privilege is that it removes the conclusive presumption of malice otherwise attaching to words that are actionable per se and thereby casts on the plaintiff a technical burden of proof in that respect. This does not require any greater degree of proof by the plaintiff, because the offensive character of the words still is sufficient by itself to support an inference of malice. The practical difference, therefore, is that in the one case the instructions do not require a finding of malice as a condition to recover and in the other they do.[61]

59. *Baskett,* 228 S.W. at 675.

60. *Tucker v. Kilgore,* Ky., 388 S.W.2d 112, 115 (1964) (citing PROSSER & KEETON ON TORTS at 625 (2d ed.1955)). *See also Baker,* 218 S.W. at 285 ("That a defendant would lose his right of qualified privilege if he acted malicious or in excess of the privilege, or with knowledge of the falsity of the communication, is well settled."); *Columbia Sussex,* 627 S.W.2d at 275 (privilege was "qualified by the proviso that it not be abused, *i.e.,* that whatever defamation may have been spoken related solely to the investigation, that the remarks not be over-publicized, and that they not be published with malice." (citing *Baker* )).

61. *Tucker v. Kilgore* 388 S.W.2d at 114. *See also McClintock v. McClure,* 171 Ky. 714, 188 S.W. 867 (1916) ("The fact that the publication was made in a qualifiedly privileged communication simply relieves the publication from the presumption of malice otherwise attendant, and puts upon the [plaintiff] the burden of proving malice; but it does not change the actionable quality of the words published, nor is there any difference in the malice in the one case presumed but in the other to be proven ... which is merely an evidential distinction and nothing more.");

statement was part of an internal memoranda detailing an audit of appellant's branch. Reports of this nature are protected by a qualified privilege because they are necessary communications within the employing company."); *Columbia Sussex,* 627 S.W.2d at 275 (recognizing qualified privilege in connection with investigation of crime in employment context); *Caslin v. General Electric Co.,* Ky. App., 608 S.W.2d 69, 70–71 (1980) (characterizing work performance appraisals as "communications within the employing company which are necessary to its functioning and, therefore ... qualifiedly privileged."); *Louisville & N.R. Co. v. Marshall,* Ky.App., 586 S.W.2d 274 (1979) (recognizing privilege for performance reports by virtue of terms of collective bargaining agreement). *Cf. Baker,* 218 S.W. at 285 (recognizing common interests of a corporation's stockholders).

56. *Baskett,* 228 S.W. at 675 (1921).

57. *See Thompson v. Bridges,* 209 Ky. 710, 273 S.W. 529, 530–31 (1925).

58. *Stewart v. Williams,* 309 Ky. 706, 218 S.W.2d 948, 950 (1949).

▮▮▮ Thus, a directed verdict in Appellees' favor would be appropriate despite Appellants' prima facie case of defamation per se if the jury could not have reasonably found both that the statements in question were false and that Appellees had waived any claim of privilege through abuse and/or malice.[62] The Court of Appeals below found the "truth defense" to be Appellees' trump card:

> The record clearly established that eating claims candy without paying was plainly against published company policy. The Associate Handbook specifically addresses such situation:
>
>> Dishonesty in any form will result in immediate termination. . . .
>>
>> In a retail environment, taking anything, large or small, is dishonest. For example, eating candy from a broken bag without paying for it is dishonest.
>
> Upon the foregoing, the act of eating claims candy without paying was considered a dishonest act and constituted grounds for dismissal. The simple fact is that [Appellants] "took" company property without paying; this constituted theft of company property. As a matter of law, we hold that Wal–Mart's alleged statements surrounding appellees' termination were not actionable as such statements were true. . . .

Although the parties' briefs address themselves primarily to this finding by the Court of Appeals, we conclude that it is unnecessary for us to wade into the issue of whether "company policy," as actually implemented in the Wal–Mart store in question, permitted or prohibited the consumption of claims candy because the defamatory statements in this case attributed larcenous actions beyond mere claims candy consumption to Appellants. In the second defamatory statement of which Appellants complain, the Assistant Manager stated that "there was more to" Appellants' termination than the theft of claims candy, which, in the context stated, could reasonably have been, and was, according to the testimony of Wal–Mart employee Joyce Floyd, who overheard the statement, interpreted as an assertion that Appellants had stolen items in addition to claims candy.[63] This defamatory statement, for which Appellees were vicariously liable,[64] appears to have no factual basis whatsoever, and thus Appellees cannot rely upon its truth in defense to Appellants' defamation claim. Although the context of the statement suggests the possibility of a qualified privilege, a jury could easily and reasonably have found that the privilege was exceeded in this case. It is clear that "when . . . there is any evidence of actual

_Tanner v. Stevenson_, Ky., 138 Ky. 578, 128 S.W. 878, 882 (1910) ("The only difference between cases where qualified privilege is relied on and cases where the defense is a general denial or justification is that where privilege is pleaded the burden of showing actual malice is put upon the plaintiff. . . . In other words, the circumstances under which the publication was made, if it is privileged, rebut the inference of malice that under ordinary conditions would arise from such a publication.")

**62.** _Columbia Sussex_, 627 S.W.2d at 276 ("Privilege having been placed in issue, it thereupon falls upon plaintiff to defeat this

defense by a showing that either there was no privilege under the circumstances or that it had been abused."); _Id._ ("[W]hether or not [a qualified privilege] has been waived is factual.").

**63.** _See Yancey_, 786 S.W.2d at 858; _Deitchman v. Bowles_, 166 Ky. 285, 179 S.W. 249, 249 (1915) ("[I]n the absence of accompanying language determining the quality of expressions having two interpretations, one actionable, and the other nonactionable, it is for the jury to determine in which sense the language was spoken.").

**64.** _See Dossett_, 451 S.W.2d at 845–46.

malice or malice in fact, the case should go to the jury." [65] While actual malice "requires a showing of knowledge of falsity of the defamatory statement or reckless disregard of its truth or falsity," [66] "[m]alice can be inferred from the fact of ... falsity." [67] Accordingly, regardless of the truth or falsity or privileged nature of any of the other defamatory statements, we cannot conclude that the jury's verdict as to defamation was flagrantly against the evidence, and we thus reverse the opinion of the Court of Appeals as to its disposition of the defamation claim and reinstate the trial court's liability judgment.

### D. INVASION OF PRIVACY / VIOLATION OF KRS CHAPTER 526

Count IV of Appellants' First Amended Complaint alleged:

1. That during the month of June 1995, the defendants, Wal–Mart Store, Inc. and Anthony Whitaker, by and through its authorized representatives intentionally installed or had installed an eavesdropping device (to wit, a video camera with audio recording), in the work area of the plaintiffs, Virginia Stringer, Reual E. Angel, Donnie H. Brummett, and Tina Sparks.

2. That said eavesdropping device was installed or placed with the knowledge that it was to be used for eavesdropping, in violation of KRS 526.030.

3. That the defendants, Wal–Mart Stores, Inc. and Anthony Whitaker, did in fact eavesdrop and record the private oral communications of the plaintiffs, Virginia Stringer, Reual E. Angel, Donnie H. Brummett, and Tina Sparks, without the consent of at least one party to said conversations, in violation of KRS 526.020.

4. That the defendants, Wal–Mart Stores, Inc. and Anthony Whitaker, knowingly used or divulged information obtained through eavesdropping in violation of KRS 526.060.

5. That the acts of the defendants, Wal–Mart Stores, Inc. and Anthony Whitaker, described above resulted in the invasion of the plaintiff's [sic] right to privacy in their oral communications.

6. That as a result of said invasion of privacy, the plaintiffs, Virginia Stringer, Reual E. Angel, Donnie H. Brummett, and Tina Sparks, have sustained injury to their reputation in the community; mental anguish; loss of income and benefits, and are entitled to recover from the defendants, Wal–Mart Stores, Inc. and Anthony Whitaker, appropriate compensatory damages.

7. That the actions of the defendants, described above were malicious and intentional and thus the plaintiffs, Virginia Stringer, Reual E. Angel, Donnie H. Brummett, and Tina Sparks, are entitled to recover punitive damages.

The trial testimony revealed that, at the direction of Whitaker and Lee Schollenberger, District Loss Prevention Manager and Whitaker's superior, Wal–Mart engaged in approximately forty hours of audio and video surveillance in the claims area of the Monticello Wal–Mart store without the employees' knowledge. The surveillance originated when Whitaker in-

---

**65.** *Tanner,* 128 S.W. at 882.

**66.** *McCall,* 623 S.W.2d at 885 (citing *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

**67.** *Thompson,* 273 S.W. at 531.

structed Assistant Manager Steven Littrell to obtain a "camcorder" from store stock and to set it up in the claims area. The camcorder selected had audio capabilities (unlike Wal–Mart's closed-circuit surveillance equipment located in fixed locations elsewhere in the store).

Fairly late in the trial court proceedings, Appellants amended their complaint to add a claim for "invasion of privacy." The claim itself, however, bore little resemblance to the label Appellants placed upon it, and it appears from the record that a great deal of confusion has resulted and continues to result from Appellants' alternative characterizations of the claim as either a common law right of privacy claim premised upon a defendant's intrusion upon the plaintiff's seclusion [68] or a claim under KRS 446.070 to recover damages for a violation of unspecified KRS Chapter 526 eavesdropping offenses. In their brief to this Court, however, Appellants admit that this "cause of action for illegal eavesdropping can best be described as an action for statutory violation of the eavesdropping statutes[.]" The trial court, however, granted partial summary judgment to Appellants "upon the issue of an invasion of privacy by virtue of the illegal activities of the defendants, namely surreptitious eavesdropping" and its jury instructions informed the jury that Appellees violated Appellants' *rights of privacy* via illegal audio surveillance and instructed the jury to award damages to compensate Appellants *"as a result of the invasion of privacy."*

We observe that, by virtue of the fact that the trial court's summary judgment order did not address any of the elements of a claim for common law invasion of privacy, the trial court appears to have treated Appellants' claim as one for civil recovery for a violation of a statute. Accordingly, we, like the Court of Appeals below, will evaluate the claim as Appellants now describe it.

The Court of Appeals held that: (1) the trial court erred when it granted partial summary judgment for Appellants because "Wal–Mart's conduct in recording conversation in the claims area as a mere incident of their intent to video the area fall[s] short of intent.... [W]e are convinced that the acts of Wal–Mart were not offensive to the eavesdropping statute"; and (2) Appellees were entitled to a directed verdict at trial because Appellants failed to prove that they suffered any damages as a result of a violation of any of the KRS Chapter 526 eavesdropping offenses:

Recovery under [KRS 446.070] may not be had merely because another has violated the act, but rather the one seeking recovery must have sustained some special injury and the injury must be the proximate result of the statute's violation. In short, the statute does not give a right of action against every person violating a statute, but only to persons suffering an injury as a direct and proximate result thereof; and then only for such damages as they may actually sustain.

Appellees failed to prove any damage suffered as a result of the recorded conversations, and we think it incumbent upon appellees to demonstrate injury resulting from Wal–Mart's audio surveillance. Hence, we are of the opinion that appellees failed to prove damages flowing from the illegally recorded conversations. We must conclude that Wal–Mart was entitled to a directed verdict.

---

**68.** *See* ELDER, *supra* note 41 at § 3.03; *Rhodes v. Graham,* 238 Ky. 225, 37 S.W.2d 46 (1931).

Although Appellants dispute both of the Court of Appeals's holdings, we address only the second one because it is clear from the record that Appellants failed to demonstrate any cognizable damages from any violation of a KRS Chapter 526 offense that may have occurred in this case. Appellants' brief does not direct this Court to any testimony from which a jury could conclude that, as a result of the audio recording of conversations in the claims area, any of the Appellants suffered the "injury to their reputation in the community; mental anguish; [and] loss of income and benefits" that they asserted in their complaint. In fact, Appellants simply assert that "the Court of Appeals ignored the fact that all of Wal–Mart's egregious conduct toward the Appellants flowed from the illegal eavesdropping and the fact that the conversations/voices recorded via illegal means were used to identify and terminate the employees." In other words, Appellants appear to base their damages under this claim upon an apparent belief that they would not have been "caught" and fired if their voices had not been illegally recorded. We find Appellant's claim that the audio surveillance "started the whole mess" to be a red herring that fails to demonstrate injury from the alleged statutory violation itself and observe that Appellant is permitted to recover for any subsequent tortious conduct, *i.e.*, the "downstream" defamation that they now assert "flowed" from the audio surveillance. In any event, however, we observe that Whitaker testified that he did not need the audio portions to identify Appellants and that he could identify the persons on the videotape without their voices, and this unrebutted testimony breaks even the tenuous chain of causation upon which Appellants rely. We agree with the Court of Appeals's conclusion that Appellants' failure to prove damages stemming from any illegal audio surveillance entitled Appellees to a directed verdict, and we therefore affirm that portion of the Court of Appeals's opinion.

## E. DAMAGES

Although we agree with Appellants' contention that Appellees' arguments concerning the jury's damage awards are not properly before the Court because Appellees did not file a cross-motion for discretionary review on that issue,[69] our conclusion that Appellees were entitled to directed verdicts as to two of the three claims upon which the jury awarded damages to Appellants requires us to address the jury's damage award. We observe that Appellants sought common elements of damages under each claim and that the jury's compensatory and punitive damages verdicts did not segregate the damages awarded for each claim. As such, we find it impossible to determine what portion, if any, of the jury's compensatory and punitive damage verdicts was attributable to actions on the part of Appellees for which they had no liability to Appellants. Accordingly, we vacate the previous damage awards and remand the case for the trial court to conduct a retrial solely to determine appropriate awards of damages as to Appellants' defamation claims.

## III. CONCLUSION

For the above reasons, we: (1) affirm the Court of Appeals's reversal of the judgments for Appellants on their IIED/outrage and right of privacy/eavesdropping claims; (2) reverse the Court of

---

69. CR 76.21; *Commonwealth of Kentucky, Transportation Cabinet v. Taub*, Ky., 766 S.W.2d 49 (1988).

Appeals's reversal of and reinstate the judgments for Appellants on their defamation claims; and (3) vacate the previous damage awards and remand the case for the trial court to conduct a retrial solely to determine appropriate awards of damages as to Appellants' defamation claims.

LAMBERT, C.J.; JOHNSTONE and STUMBO, JJ., concur.

GRAVES, J., concurs as to parts I; II(A), (B), (D), (E); and III and dissents as to part II(C) by separate opinion in which COOPER and WINTERSHEIMER, JJ., join.

GRAVES, Justice, dissenting.

The majority presents a sound and thorough explanation of the law of defamation in Kentucky. However, the legal analysis presented in the majority opinion reminds me of Mark Twain's observation, "Truth is mighty and will prevail. There is nothing the matter with this, except that it ain't so." Truth is a complete defense to defamation claims; unfortunately, the sophistry of persuasive attorneys has convinced both the jury and this Court of an unreasonable interpretation of the alleged defamatory statement.

The statement that, " '[t]here was more to it than that' and that he couldn't talk about it" appears to be the jackpot in the majority's search for anything capable of a defamatory meaning. Unfortunately, there is nothing in that statement that a reasonable juror could find defamatory. The statement is clearly offensive to a disgruntled employee, and while I sympathize with Appellants' attitude toward their former employer, I fail to find any reasonable defamatory meaning to an objective observer that would establish Appellees' liability. Of all the facts alleged in Appellants' brief, I found the statement made by the Assistant Manager reflected a measure of decorum in that it conveyed nothing at all. "There's more to it than that" generally means, "I don't want to talk about it:" an interpretation that seems exceptionally reasonable when he continued to say exactly that. The statement would not imply any wrongdoing to a reasonable listener.

Here, Appellants' own admissions established the truth of Wal–Mart's statements regarding Appellants' terminations. Appellants' defamation claim is that Wal–Mart and Whitaker implied to others that Appellants were thieves. Yet, all four of these former employees admit that it was they—not their employer—who used the terminology "thief" to describe the reason for their discharge.

Even assuming that Mr. Whitaker "imputed" theft as the reason for Appellants' discharge, the statement is true.[1] A thief is someone who takes something that does not belong to him. Or, as the Court of Appeals correctly reasoned: "The simple fact is that Appellees 'took' company property without paying; this constituted theft of such company property."

Even though the food Appellants admitted eating had no value to Wal–Mart and could not be paid for, Appellants' "destined for the dumpster" argument is wholly irrelevant to the fact that they violated the company's dishonesty policy. It is also disingenuous in that it ignores the fundamental distinction between taking

---

1. The fact that Appellants had to rely on claims of "imputation," effectively concedes the fact that they could not, and clearly did not, prove that any of the actual words spoken or written about them by Wal–Mart were false. *See Pierce v. Capital Cities Communica-* tions, Inc., 576 F.2d 495, 509 (3rd Cir.1978), cert. denied, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978) (claim of false implications "by its own terms, concedes that no specific statement... was incorrect").

merchandise from the claims area before the claims clerk is able to process it—which deprives Wal–Mart of receiving credit for damaged goods—and consuming merchandise in the employees' lounge with management approval after it has been processed and accounted for in order to maintain inventory control. For claims processing purposes, the candy had residual value to Wal–Mart and Appellants had no right to appropriate it.

Mr. Whitaker's policy is undisputed: employees cannot eat anything from claims before it is recorded and accounted for, and even then not without permission. Appellants admit this fact. At the employee meeting several days before Appellants were fired, Mr. Whitaker reiterated the policy in no uncertain terms: "And, if anyone has taken anything without paying for it, then you need to stop it immediately."

Likewise, Appellants point to the testimony of John Pennycuff, a disgruntled former employee of Wal–Mart and former brother-in-law of Ms. Sparks, for the notion that eating claims candy before processing is okay. Mr. Pennycuff's testimony is probative of nothing about the Monticello store policies in 1995. Mr. Pennycuff had not been employed with the Monticello store for three years before Appellants were terminated. He admitted having no personal knowledge of either how they were discharged or how Mr. Whitaker enforced the written policy against dishonesty.

It is true that Appellants consumed unprocessed claims merchandise belonging to Wal–Mart. It is also true that consuming claims merchandise is a violation of Wal–Mart's honesty policy. It is finally true, then, as marked on Appellants' termination forms, that they were discharged for violation of company policy and unauthorized removal of company property.

Based on the truth defense and the unreasonableness of a defamatory meaning to any of the alleged defamatory statements, I would affirm the Court of Appeals. The alleged defamation was not only substantially true, but also true in its essential parts.

COOPER, J., and WINTERSHEIMER, J., join in this dissent.