*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0230p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

In re: STANLEY LOWENBRAUN,

　　　　　　　　　　　　　　　　*Debtor.*

—————————————————

ETHEL LOWENBRAUN,

　　　　　　　　　　　　　　　　*Appellant,*

　　　　*v.*

THOMAS L. CANARY, JR. and MAPOTHER &
MAPOTHER, PSC,

　　　　　　　　　　　　　　　　*Appellees.*

No. 05-6032

—————————————

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 04-00627—John G. Heyburn II, Chief District Judge.

Argued: May 30, 2006

Decided and Filed: July 6, 2006

Before: GILMAN, SUTTON, and COOK, Circuit judges.

—————————————

## COUNSEL

**ARGUED:** Bryan N. Coomer, Louisville, Kentucky, for Appellant. Carl D. Frederick, SEILLER WATERMAN, Louisville, Kentucky, for Appellees. **ON BRIEF:** Bryan N. Coomer, Louisville, Kentucky, for Appellant. Carl D. Frederick, Paul J. Hershberg, SEILLER WATERMAN, Louisville, Kentucky, for Appellees.

—————————————

## OPINION

—————————————

　　　　RONALD LEE GILMAN, Circuit Judge. Ethel Lowenbraun was married to Stanley Lowenbraun, once a successful oncologist who fell into financial ruin due to a gambling addiction. Ethel and Stanley legally separated in 1998, and Stanley filed a Chapter 7 bankruptcy petition shortly thereafter. Thomas Canary, along with his law firm Mapother and Mapother (collectively, Canary), was hired by the trustee of the bankruptcy estate to investigate whether some of the transfers made from Stanley to Ethel pursuant to their legal separation constituted an improper

1

diversion of funds from the bankruptcy estate. In the course of his duties, Canary brought contempt proceedings against Ethel and Stanley.

Ethel subsequently filed suit in a state trial court in Kentucky, accusing Canary of libel, slander, abuse of process, wrongful use of civil proceedings, and outrageous conduct. Canary removed the action to the Bankruptcy Court for the Western District of Kentucky, which decided to retain jurisdiction over the matter despite Ethel's motions for mandatory abstention and for remand to the Kentucky state court. The bankruptcy court held as a matter of law that Canary was entitled to absolute immunity for his statements and, in the alternative, that Canary was entitled to summary judgment on the merits of the case. This decision was affirmed by the district court, and Ethel timely appealed. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

In 1998, Stanley and Ethel legally separated and entered into a Property Settlement Agreement. Pursuant to the agreement, Stanley transferred to Ethel an Individual Retirement Account (IRA) worth $1 million and all of his stock in the S. L. Thoroughbreds Corporation, which was valued at approximately $2.5 million.

Stanley filed for Chapter 7 bankruptcy shortly after these transfers. William Lawrence was designated as the bankruptcy trustee. Lawrence's duties as trustee required him to (1) investigate the acts, conduct, assets, liabilities, and financial condition of Stanley, (2) collect and liquidate the property of the estate, and (3) make a final report and distribute the net assets to the estate's creditors. *See* 11 U.S.C. § 704. Pursuant to 11 U.S.C. § 327(a), Lawrence hired Canary to act as counsel in order to assist Lawrence in the administration of the estate.

Lawrence specifically requested that Canary investigate the IRA and stock transfers made from Stanley to Ethel to determine if the transfers were improper under either the Bankruptcy Code or Kentucky law. After concluding that the transfers were marked with "badges of fraud," Canary filed an adversary proceeding in the bankruptcy court against Stanley and Ethel, alleging that the Bankruptcy Code and Kentucky law prohibited the transfers. As a result of this adversary proceeding, the parties reached an Adversary Proceeding Settlement Agreement (APSA) in August of 2001 in which Ethel agreed to transfer $1.2 million from her IRA to the bankruptcy estate, and the estate agreed to release its claim to the disputed Thoroughbreds Corporation stock.

The APSA provided a particular method for accomplishing the $1.2 million transfer: (1) Ethel was to transfer funds from her IRA to an IRA established in Stanley's name alone, (2) those funds were to be immediately transferred from Stanley's IRA to the estate, and (3) all transfers were to be supervised by a representative of Merrill Lynch. Once the transfers were completed, the trustee agreed to release Ethel from the estate's claims and to dismiss the adversary proceeding. In a Supplemental Property Settlement Agreement (SPSA) entered into in August of 2001, Ethel agreed to accept $6,000 per month from Stanley's disability proceeds in order to compensate her for the $1.2 million transfer.

Ethel transferred the $1.2 million on October 8, 2001. But the parties dispute whether the transaction complied with their agreement and whether Canary knew of the transfer when it was made. Ethel contends that her transfer of the $1.2 million to a "newly-established Merrill Lynch IRA account solely in Stanley's name" fully satisfied "all of her obligations under the said Agreement." She claims that, upon the transfer, the funds immediately were under the control of the bankruptcy estate and that Canary did nothing to protect the funds even though he had actual knowledge of the transaction.

To prove that Canary had actual knowledge of the October transfer, Ethel relies on a letter sent by Jan Morris, Stanley's attorney, to Canary. Morris instructed Canary in the letter to safeguard the funds at Merrill Lynch while they remained in Stanley's account. Specifically, Ethel emphasizes that Morris and Canary entered into a side agreement in which they agreed to delay the transfer of the funds from Stanley's IRA to the bankruptcy estate until February of 2002 in order to avoid the 10% early withdrawal penalty—suggesting that Canary had actual knowledge that Ethel had transferred the funds. Canary also sent a letter to Morris in which he praised "Dr. [Stanley] Lowenbraun's willingness to hold on to the funds for this additional time." Ethel asserts that these documents, taken together, indicate that Canary knew of the transfer.

Canary contends, however, that the documents referred to by Ethel do not conclusively establish his knowledge of the transfer. He offers as proof a letter that he sent to Morris on October 11, 2001—three days after the transfer—in which he stated that to his knowledge the transfer had not yet occurred. Canary also highlights language from a draft motion to delay the funding of the settlement that was attached to his letter sent to Morris. In this letter, Canary writes that "the source of the funding of the Trustee's settlement is an IRA account *to be transferred* from Ethel Lowenbraun to Stanley Lowenbraun." (Emphasis in original.) The draft motion also provided that Ethel and Stanley should prepare "all papers necessary to transfer these funds to the estate effective February 17, 2002." Canary argues that the use of the future tense in the draft motion circulated on November 21, 2001 indicates that he was not aware of the October transfer.

In January of 2002, without the knowledge or consent of the other interested parties and before Canary claims that he knew of the transfer, Stanley withdrew the $1.2 million from the IRA and presumably squandered the funds. Canary, on behalf of the trustee, then brought a contempt proceeding against Stanley and Ethel, alleging that they took the funds in contravention of the APSA. In conjunction with the proceeding, Canary filed an Emergency Motion for Stanley and Ethel Lowenbraun to Pay Over Settlement Funds or to Show Cause Why They Should Not Be Held in Contempt (the Contempt Motion). The Contempt Motion requested that Stanley and Ethel account for the funds or, in the alternative, be held in contempt of court. Canary also faxed a letter to the trustee and to the estate's creditors informing them that the $1.2 million was not accounted for.

Andrew Wolfson, a reporter for the *Louisville Courier-Journal*, who was following these proceedings, interviewed Canary in conjunction with two articles that were published in the newspaper. Wolfson's articles suggested that Ethel and Stanley had committed bankruptcy fraud, and that Canary was going to refer them to the federal authorities for prosecution.

The parties eventually negotiated a settlement, which was memorialized in the Order Amending Agreed Judgment Resolving Motion to Hold Stanley Lowenbraun and Ethel Lowenbraun in Contempt of Court (Amended Order). In the Amended Order, Ethel agreed to accept a reduced amount of $5,000 per month from Stanley's disability insurance proceeds to compensate her for Stanley's defalcation. Ethel had previously been entitled to $6,000 per month. The estate agreed to accept, among other things, $1 million of the $2 million in life insurance proceeds that will be due upon Stanley's death.

In 2003, Ethel brought suit in a Kentucky state court, alleging that Canary's actions constituted libel, slander, abuse of process, wrongful use of civil proceedings, and the tort of outrage. Ethel relied on allegations made by Canary in both the Contempt Motion and in the *Courier-Journal* articles as the basis for her state-law tort claims. Canary removed the case to the bankruptcy court. Ethel responded by requesting the bankruptcy court to abstain from hearing the case and to send the matter back to the Kentucky state court. The bankruptcy court denied Ethel's motion.

It held that Canary was entitled to litigation-related immunity from Ethel's state-law claims and, in the alternative, granted summary judgment to Canary on the merits of the case. The district court affirmed. On appeal, Ethel argues that the bankruptcy court erred in denying her motion for mandatory abstention, in failing to remand the case to the Kentucky state court, in granting immunity to Canary for his judicial and extrajudicial statements, and in granting summary judgment to Canary on Ethel's state-law claims.

## II. ANALYSIS

### A.        Standard of review

In an appeal from the bankruptcy court, we directly review the decision of that court rather than the intermediate decision of the district court. *In re M.J. Waterman & Associates, Inc.*, 227 F.3d 604, 607 (6th Cir. 2000) (holding that "this court is in as good a position to review the bankruptcy court's decision as is the district court") (citation and quotation marks omitted). The bankruptcy court's legal conclusions are subject to de novo review, and its factual findings are reviewed under the clearly erroneous standard. *Id.*

### B.        Jurisdiction of the bankruptcy court and the Kentucky state court to hear Ethel's claims

Ethel argues that the bankruptcy court erred in failing to abstain from hearing her state-law claims and in concluding that the state court lacked jurisdiction over those claims pursuant to the *Barton* doctrine. We will first address Ethel's abstention argument and then discuss the implications of the *Barton* doctrine on the Kentucky state court's jurisdiction.

#### 1.        *Jurisdiction of the bankruptcy court*

Depending upon the legal and factual circumstances, a bankruptcy court either *must* abstain from hearing a state-law claim (mandatory abstention), 28 U.S.C. § 1334(c)(2), or *may* abstain (permissive abstention), 28 U.S.C. § 1334(c)(1). The mandatory abstention provision states as follows:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under [the Bankruptcy Code] but not arising under [the Bankruptcy Code] or arising in a case under [the Bankruptcy Code], with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

*Id.* § 1334(c)(2). Interpreting this provision, this court held in *In re Dow Corning Corp.*, 86 F.3d 482, 497 (6th Cir. 1996), that

> [f]or mandatory abstention to apply, a proceeding must: (1) be based on a state law claim or cause of action; (2) lack a federal jurisdictional basis absent the bankruptcy; (3) be commenced in a state forum of appropriate jurisdiction; (4) be capable of timely adjudication; and (5) be a non-core proceeding.

*Id.* The parties agree that Ethel's action satisfies the first four requirements of *In re Dow Corning*. Whether her state-law action was properly characterized by the bankruptcy court as a core proceeding is therefore the issue in dispute.

Core proceedings are described in 28 U.S.C. § 157. According to that provision, core proceedings include but are not limited to "matters concerning the administration of the estate." *Id.* § 157(b)(2) (setting forth a nonexhaustive list of proceedings considered "core."). Section 157 additionally provides that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." *Id.* § 157 (b)(3).

Interpreting § 157(b)(2), this court has held that "[a] core proceeding either invokes a substantive right created by federal bankruptcy law or one which could not exist outside of the bankruptcy." *Sanders Confectionary Prods., Inc. v. Heller Financial, Inc.*, 973 F.2d 474, 482 (6th Cir. 1992) (holding that an action was a core proceeding where "a successful action on the [] plaintiffs' part could have affected the outcome of the bankruptcy proceeding"); *see also In re DeLorean Motor Co.*, 155 B.R. 521, 525 (B.A.P. 9th Cir. 1993) (holding that even if a claim fits within the literal language of § 157(b)(2), it will not be considered a core proceeding "if it is a state law claim that could exist outside of bankruptcy and is not inextricably bound to . . . a right created by the Bankruptcy Code.") (interpreting *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982)).

Ethel contends that her state-law action was not a core proceeding and that the bankruptcy court therefore erred in failing to abstain. In support of this proposition, she argues that (1) her transfer of the $1.2 million in October of 2001 made her "irrelevant to estate matters" before the adversary proceeding was filed, and (2) her tort claims would have no conceivable effect on estate administration. A review of the facts and the relevant caselaw, however, indicates otherwise.

Even if Ethel fully satisfied her obligation by transferring the $1.2 million, which is disputed by the parties, that would not be dispositive in determining whether her state-law action was a core proceeding. In *In re Douglas L. Heinsohn*, 247 B.R. 237, 242-44 (E. D. Tenn. 2000), the bankruptcy court held that the plaintiff's state-law action was a core proceeding even though the bankruptcy estate was closed before the plaintiff initiated his suit. *Id.* (holding that "[t]here is no bright-line rule dictating that once an estate has been fully administered a trustee cannot avail himself of the federal court's bankruptcy jurisdiction") (alteration in original) (citation and quotation marks omitted).

Ethel's argument that her lawsuit would have no effect on the administration of the bankruptcy estate similarly fails because the genesis of her state-law action was the bankruptcy proceeding. She transferred the $1.2 million as a result of the APSA, and Canary's actions to investigate the transfer and to recover the missing funds were performed in accordance with his duties as the trustee's counsel. The $1.2 million transferred by Ethel and subsequently squandered by Stanley belonged to the estate pursuant to the APSA. If Ethel had complied with the terms of the APSA, which required the transfer to be supervised by a representative of Merrill Lynch, moreover, Canary would not have had to investigate what had happened to the missing funds. Canary's filing of the Contempt Motion, upon which Ethel's state-law action was based, was thus inextricably bound to the bankruptcy proceeding.

This conclusion gains support from the relevant caselaw. In *In re Heinsohn*, 247 B.R. at 244, for example, the court characterized the plaintiff's malicious prosecution and defamation claims against a bankruptcy trustee as a core proceeding because the conduct about which the plaintiff complained "would not have arisen but for Defendant's obligations and conduct as a trustee." Similarly, in *In re DeLorean*, 155 B.R. at 525, the bankruptcy court classified a state-law action as a core proceeding because "[t]he action arises from the efforts of officers of the estate to administer the estate and collect its assets and therefore impacts the handling and administration of the estate." 155 B.R. at 525.

Canary's status as counsel to the trustee, rather than as a trustee himself, does not alter our analysis. This court held in *Allard v. Weitzman*, 991 F.2d 1236, 1241 (6th Cir. 1993), that so long as "they act at the direction of the trustee and for the purpose of administering the estate or protecting its assets," counsel and other court-appointed officers who represent the estate "are the functional equivalent of [the] trustee." Because Ethel's claims would not exist but for the bankruptcy proceeding, and because Canary filed the Contempt Motion to assist in the administration of the estate, Ethel's state-law action was a core proceeding, thus precluding mandatory abstention. We therefore find no error in the bankruptcy court's denial of Ethel's motion to abstain.

### 2.      *The jurisdiction of the Kentucky state court*

According to this court's decision in *Allard*, "[i]t is well-settled that leave of the [bankruptcy] forum must be obtained by any party wishing to institute an action in a [state] forum against a trustee, *for acts done in the trustee's official capacity and within the trustee's authority as an officer of the court*." 991 F.2d at 1240 (emphasis added). This doctrine, known as the *Barton* doctrine, applies to trustees' counsel as well as to trustees themselves, and its purpose is to "enable[] the Bankruptcy Court to maintain better control over the administration of the estate." *Id*. at 1241. In the present case, Ethel filed her complaint against Canary in the Kentucky state court without first obtaining leave from the bankruptcy court. The bankruptcy court held, and Canary now argues, that her failure to obtain leave constituted a clear violation of the *Barton* doctrine, thus depriving the Kentucky state court of jurisdiction.

Ethel contends, however, that Canary's actions about which she complains were outside the scope of Canary's authority. In support of this proposition, Ethel emphasizes that she and Stanley were legally separated and that she had satisfied her obligation to transfer the $1.2 million months before Canary began his investigation of the missing funds. Ethel claims that these facts indicate that Canary was acting outside of his authority when he named her in the Contempt Motion and when he discussed the missing funds with the reporter for the *Courier-Journal*. In fact, because Ethel alleges that Canary knew of the transfer, she suggests that Canary "intentionally concoct[ed] false allegations against Ethel to hide his own negligence in failing to safeguard the [missing funds]." Ethel thus claims that the *Barton* doctrine is inapplicable and that the Kentucky state court retained jurisdiction.

When faced with a similar question, the bankruptcy court in *In re Heinsohn* "presume[d that] acts were a part of the trustee's duties unless Plaintiff initially alleges at the outset facts demonstrating otherwise." 247 B.R. at 246. This presumption strikes us as persuasive. Congress intended for the Bankruptcy Code to be comprehensive and for the federal courts to have exclusive jurisdiction over bankruptcy matters. *Pertuso v. Ford Motor Credit*, 233 F.3d 417, 426 (6th Cir. 2000) (discussing the "pervasive nature of Congress' bankruptcy regulation" and the "exclusively federal nature of bankruptcy proceedings"). A presumption in favor of the trustee, counsel, or other bankruptcy official that they were acting within the scope of their duties prevents a plaintiff like Ethel from making unsupported allegations in an attempt to defeat Congress's goal of providing exclusive federal jurisdiction over bankruptcy matters.

We adopt the approach of *In re Heinsohn* and conclude that Ethel's failure to offer evidence supporting her allegation that Canary's actions were prompted by improper motives is insufficient to undermine the application of the *Barton* doctrine. The bankruptcy court thus committed no error when it denied Ethel's motion to remand the case to Kentucky state court.

## C.      **Canary is entitled to immunity for his litigation-related comments**

After the bankruptcy court properly determined that it had jurisdiction to hear Ethel's state-law claims, it held that the doctrine of immunity barred her action. This legal determination is

subject to de novo review. *In re M.J. Waterman*, 227 F.3d at 607. Ethel argues on appeal that Canary forfeited any claim to immunity because his conduct was outside the scope of his authority and was irrelevant to the issue before the bankruptcy court.

With regard to the Contempt Motion, Kentucky law has long provided that "statements in pleadings filed in judicial proceedings are absolutely privileged when material, pertinent, and relevant to the subject under inquiry." *Heavrin v. Nelson*, 384 F.3d 199, 202 (6th Cir. 2004) (interpreting Kentucky law) (citation and quotation marks omitted). *But cf. Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 797 (Ky. 2004) (holding that any privilege is forfeited if the "defendant steps outside the scope of the privilege, or abuses the occasion"). This absolute privilege applies even if, as is the case here, the plaintiff alleges that the statements were false. *Gen. Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1127 (6th Cir. 1990) (interpreting Kentucky law to hold that statements made preliminary to a judicial proceeding were privileged). Unlike a qualified privilege, the absolute privilege "renders the speaker's motives and intent irrelevant in light of the public policy favoring freedom to speak freely and without fear of civil suit and financial hazard." *Id.* at 1128-29. Kentucky law therefore makes clear that Canary's statements in the Contempt Motion are absolutely privileged so long as they were "material, pertinent, and relevant to the inquiry." *Heavrin*, 384 F.3d at 202.

Ethel argues that Canary's judicial statements were not privileged because they were made outside the scope of his authority and because Ethel's actions were irrelevant to the bankruptcy proceeding by the time Canary filed the Contempt Motion. The linchpin of Ethel's claim is that she had fully satisfied her obligation to the bankruptcy estate when she transferred the $1.2 million in October of 2001. As discussed above, however, Canary's role as counsel for the trustee permitted him to investigate Ethel's transfer and to recover assets properly belonging to the bankruptcy estate. Canary's actions, moreover, benefitted the estate. Due to the Contempt Motion and resulting settlement, Ethel agreed to accept $5,000 per month from Stanley's disability proceeds rather than the $6,000 to which she was previously entitled—leaving the remaining $1,000 per month to benefit the estate. Any statements made in the course of Canary's investigation and recovery effort were thus within the privilege. Canary is therefore entitled to immunity for his judicial statements.

Whether Canary is entitled to immunity for his extrajudicial statements (i.e., those to the reporter for the *Courier-Journal*) presents a different question. Kentucky law provides that statements protected by an absolute privilege do not lose their privilege simply because they are reported in the newspaper. *Massengale v. Lester*, 403 S.W.2d 701, 702 (Ky. 1966) (holding that the "very purpose of the privilege would be lost" if the privilege were revoked upon republication). In the present case, the record is unclear as to whether the *Courier-Journal* articles merely repeated information available in the pleadings and discussed at the emergency hearing, or whether Canary provided additional information to the reporter. Ethel nevertheless concedes that Canary's communications to the reporter would have been privileged if the information was disseminated in good faith and served a proper public purpose. *See also Weissman v. Hassett*, 47 B.R. 462, 466 (S.D.N.Y. 1985) (holding that a bankruptcy trustee was immune from liability for a report that he had prepared and distributed to the media because the dissemination served the important purpose of exposing fraud and preventing similar frauds).

Beyond bare allegations, Ethel has offered no evidence to suggest that Canary was acting in bad faith when he spoke to the *Courier-Journal* reporter. Canary's interview with the *Courier-Journal* regarding the missing funds, moreover, served a proper public purpose in that it exposed possible fraud. We therefore hold that Canary is entitled to immunity for both his judicial and extra-judicial statements. Because Canary is immune from liability, we need not address Ethel's state-law claims on the merits.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.