EBEL, Circuit Judge,
Dissenting.
I respectfully dissent, because I believe that the Barton doctrine does apply in this case, and thus that the district court lacked jurisdiction over TMS’s lawsuit.
The Barton doctrine holds that before suit may be brought against a receiver for acts performed in the receiver’s “official capacity,” “leave of the court by which [the receiver] was appointed must be obtained.” [1] See Barton v. Barbour, 104 U.S. 126, 128, 26 L.Ed. 672 (1881) (citing Davis v. Gray, 16 Wall. 203, 83 U.S. 203, 218, 21 L.Ed. 447 (1872) (explaining that an appointing court “will not allow [a receiver] to be sued touching the property in his charge, nor for any malfeasance as to the parties, or others, without its consent,” and citing cases)); see also Springer v. Infinity Group Co., No. 98-5182, 1999 WL 651391, at *1 (10th Cir. Aug. 26, 1999) (unpublished).[2]
The doctrine, which is a “jurisdictional fact” in federal court, see Barton, 104 U.S. at 131, applies to lawsuits arising from “acts done in the [receiver’s or] trustee’s official capacity and within the [receiver’s or] trustee’s authority as an officer of the court.” In re Triple S Restaurants, Inc., 519 F.3d 575, 578 (6th Cir.2008) (quotation omitted); see also Springer, 1999 WL 651391, at *1 (affirming application of the doctrine to a lawsuit that sought relief “for acts [a bankruptcy trustee] did in his official capacity as trustee”); In re Crown Vantage, 421 F.3d 963, 970-71 (9th Cir.2005) (explaining that the doctrine applies when the lawsuit is “for acts done in the [receiver’s] official capacity”); Muratore v. Darr, 375 F.3d 140, 145 (1 st Cir.2004) (applying the doctrine where “[t]he different counts in [the plaintiffs] complaint all allege [the trustee’s] misconduct in discharging his trustee’s administrative responsibilities”); Carter v. Rodgers, 220 F.3d 1249, 1252 (11th Cir.2000) (observing that the Barton rule is triggered by lawsuits “for acts done in the actor’s official capacity”).
The majority rightly points out that under Barton, “if, by mistake or wrongfully, the receiver takes possession of property *153 belonging to another, such person may bring suit therefor against him personally as a matter of right; for in such case the receiver would be acting ultra vires.” (See 0 & J at 5-6 (quoting Barton, 104 U.S. at 134).) Based on this exception to the doctrine, the majority concludes that because “TMS is alleging that Mr. Schlossberg wrongfully seized its assets rather than the assets of Mr. Palenear,” and because TMS is an “independent third party,” Barton does not apply in this case.
Yet immediately after announcing the ultra vires exception to the rule, the Barton Court distinguished, from that exception, cases in which “claims arise against the receiver as such, while acting under the powers conferred on him, whether for labor performed, for supplies and materials furnished, or for injury to persons or property.” Barton, 104 U.S. at 134 (emphasis added). What the Supreme Court appears to be saying is that ordinarily an assignee who wrongfully takes possession of property of another may be sued, but when the assignee is acting pursuant to a receivership order of another court, either the claim of wrongful taking must be brought in the receivership court or permission from the receivership court must be obtained to bring the suit elsewhere.
Federal courts analyzing subject-matter jurisdiction under the doctrine thus have looked to whether, in the conduct at issue, receivers or trustees acted “within the context of’ their court-appointed role to “recover[] assets for the estate,” Triple S Restaurants, 519 F.3d at 578; “were acting within the scope of their duties,” In re Lowenbraun, 453 F.3d 314, 322 (6th Cir.2006); allegedly committed torts “unrelated to and outside the scope of the bankruptcy proceeding,” Muratore, 375 F.3d at 147 (quotation omitted); or allegedly engaged in misfeasance “stemming from their official bankruptcy duties,” Carter, 220 F.3d at 1253. See also Muratore, 375 F.3d at 147-48 (refusing to recognize a “generalized tort exception to the Barton doctrine”); Lowenbraun, 453 F.3d at 322 (adopting a presumption that “acts were part of the trustee’s [court-ordered] duties unless Plaintiff initially alleges at the outset facts demonstrating otherwise”).
Our determination of whether the district court lacked subject-matter jurisdiction over TMS’s lawsuit thus turns simply on the question of whether the lawsuit arises from actions that Roger Schlossberg (“Schlossberg”) performed within the authority of his court-appointed role as a receiver. The West Virginia Family Court, which appointed Schlossberg during the Michael Palenear (“Palenear”) divorce proceeding, explained that authority and role as follows. Having in a February 2003 order “adjudged and ordered” that Schlossberg “shall seize any assets that [Palenear] has an ownership interest therein” (Aplt.App. at 26 (emphasis added)), the court in January of 2004 issued an amended order that recited and affirmed the terms of the February 2003 order and added,
It was and remains the intention of the Court by the aforesaid appointment of Roger Schlossberg both as Trustee and as Special Receiver that [Schloss-berg] be vested with the broadest possible powers of a Trustee or Receiver[1] acting within the equitable power of this Court and the common law of this State to investigate the financial and other affairs of [Palenear] and to be vested with actual legal and equitable title to and the right to obtain record title to and/or liens upon and/or actual physical custody and possession of all of the assets of [Palenear] (whether held by [Palenear], either alone or jointly with any other person or entity, in his own name or in the name of any *154 alias ... or in the name of any other entity, including, inter alia, ... Teton Millwork Sales) as is required to satisfy by sale, liquidation or other execution the aforesaid Judgment and all of the other Orders heretofore entered in these proceedings and as hereafter may be entered with respect to the existing and prospective obligations of [Palen-car].
(Id. at 69.)
The family court went on, in the amended order, to “take note” that certain of Palencar’s assets were located outside of West Virginia and perhaps outside of the United States. (Id. at 70.) The court explained, “[i]n order to give full force and effect to the powers herein granted to the Trustee/Special Receiver, it is the express contemplation of this Court that [Schloss-berg] shall act outside the territorial limitations of this State.” (Id. at 70.) The court then ordered that Schlossberg’s appointment as Trustee and Special Receiver, “for those purposes and with those powers above-explicated,” be “ratified and confirmed,” and further “[o]rdered, that [Schlossberg] expressly is authorized and directed forthwith to take such action as may appear necessary or desirable to obtain ancillary jurisdiction of these proceedings in such other States of the United States ... as may appear appropriate.” (Id,)
The West Virginia Family Court clearly intended for Schlossberg to have the broadest possible authority to act on its already broad orders, and for him to act outside West Virginia- — including in seizing the mail and the assets of TMS, which the court named specifically in its order. Furthermore, the order directed Schlossberg to seize not simply assets that Palencar held unilaterally and in his own name, but also “any assets” in which he “ha[d] an oumership interest,” including assets held “jointly with any other person or entity, in his own name or in the name of any alias ... or in the name of any other entity, including, inter alia, ... Teton Millwork Sales.” (Id. at 26, 29.)
As the majority opinion makes clear, TMS’s complaint alleged not that Schloss-berg was acting outside the context of this expansive court-appointed role, nor that he committed torts unrelated to and beyond the scope of that role, but rather that he engaged in misfeasance stemming from his broad official duties. See Triple S Restaurants, 519 F.3d at 578; Muratore, 375 F.3d at 147; Carter, 220 F.3d at 1253. Thus, TMS alleged that “Schlossberg seized TMS’s assets and mail even though he knew that Mr. Palencar was only a twenty-five percent shareholder in TMS and that there were no grounds to pierce the corporate veil”; that Schlossberg misrepresented to TMS employees that he was “in a position of judicial authority over Teton and ... vested with title to all the assets, property, mail, and confidential business and corporate information of Te-ton”; and that Schlossberg misrepresented to TMS employees that they “were forbidden from accepting instructions from Te- , ton, and that [they] would be subject to financial penalties if they should do so.” (0 & J at 12-13 (quotations omitted).)
The majority concludes that these allegations demonstrate “that Schlossberg acted beyond the scope of his authority by wrongfully seizing assets that did not belong to Palencar.” (Id. at 5.) Yet that conclusion fails to account for the plain language of the order, which authorized and directed Schlossberg to seize not only *155 assets that “belongfed] to Palencar” outright or even jointly with others (id. at 5, 11), but also “any assets that [Palencar] has an ownership interest therein ” (Aplt.App. at 26) (emphasis added). An order to seize assets in which Palencar has an ownership interest is patently not equivalent to a court order to seize assets that Palencar owns outright.[3] As the Complaint alleged, Schlossberg knew that Palencar had a 25% ownership interest in TMS. (0 & J at 11.) Therefore, by its explicit terms, the West Virginia Family Court Order authorized Schlossberg to seize TMS assets, because Palencar “ha[d] an ownership interest therein.”
The majority objects that a judicial order that would authorize such a seizure would be illegal, because TMS was not a party to the divorce proceeding that produced the order. (0 & J at 12, citing cases.) Indeed, much — if not most — of TMS’s complaint is similarly devoted simply to alleging that the West Virginia Family Court did not have jurisdiction over TMS, and thus could not legitimately order Schlossberg to seize TMS’s mail or assets (so that Schlossberg, in turn, was not acting pursuant to a valid court order when he did seize that mail and those assets). (See Compl. ¶¶ 17-20, 25-35, 38-40, 45-54, 62-70 (Aplt.App.1-5).) However, the Jefferson County, West Virginia, Circuit Court had already decided in Pal-encar’s and TMS’s 2005 lawsuit against Judge Wertman, who appointed Schloss-berg, that the family court acted within its jurisdiction in issuing the orders appointing Schlossberg and directing him to act as it did. (ApltApp. at 102-107.) Having failed to appeal the West Virginia Circuit Court’s decision, TMS may not now reliti-gate, on the ground that it is a putatively “independent third party” (see O & J at 6), the issue of whether the family court had jurisdiction to order Schlossberg to seize TMS’s assets.[4] See In re Scrivner, 535 F.3d 1258, 1266 (10th Cir.2008) (summarizing the doctrine of issue preclusion).
For our purposes, the dispositive facts are simply that the family court issued orders appointing Schlossberg Special Receiver and directing him to act; those orders were adjudicated valid in a case to which TMS was a party and which TMS did not appeal; and according to the allegations in the Complaint, Schlossberg performed the expansive duties — including seizing “any assets that [Palencar] has an ownership interest therein” — that the orders directed him to perform. If, while thus “acting under the powers conferred on him,” Schlossberg allegedly committed torts or other misfeasance resulting in “injury to persons or property,” Barton, 104 U.S. at 134, the Barton doctrine dictates that TMS must procure the permission of the West Virginia Family Court before it may sue Schlossberg outside that forum.
At oral argument, counsel for TMS suggested that Barton should not apply in this case because the res that Schlossberg held in his role as receiver has now been fully distributed. Our sister circuits that have *156 considered this argument have rejected it, concluding that the Barton doctrine “serves additional purposes even after the ... case has been closed and the assets are no longer in the trustee’s hands.” Muratore, 375 F.3d at 147.
Without the requirement [imposed by the Barton doctrine], trusteeship will become a more irksome duty, and so it will be harder for courts to find competent people to appoint as trustees. Trustees will have to pay higher malpractice premiums, and this will make the administration of the bankruptcy laws more expensive. ... Furthermore, requiring that leave to sue be sought enables [appointing] judges to monitor the work of the trustees more effectively. It does this by compelling suits growing out of that work to be as it were prefiled before the [appointing] judge ...; this helps the judge decide whether to approve this trustee in a subsequent case.
In re Linton, 136 F.3d 544, 545 (7th Cir.1998); see also Crown Vantage, 421 F.3d at 972; Carter, 220 F.3d at 1252-53. I agree with this reasoning, and would hold that if the doctrine otherwise applies, as it does in this case, it applies even when a “case has been closed and the assets are no longer in the trustee’s [or receiver’s] hands.”[5] Muratore, 375 F.3d at 147.
I would vacate the district court’s order and remand with instructions for the district court to dismiss TMS’s lawsuit for lack of subject-matter jurisdiction. Therefore, I would not reach the Rule 12(b)(6) dismissal.[6]

. The doctrine also applies to trustees in bankruptcy. See In re Crown Vantage, 421 F.3d 963, 971 (9th Cir.2005).

. Springer apparently is the only case this Court has decided on the Barton doctrine. Because that brief, unpublished Order and Judgment contains no commentary on or interpretation of the doctrine, however, Barton’s application is a matter of first impression in this circuit.

. Including the right to receive all mail addressed in any fashion to [Palencar], either alone or jointly with any other person, in his own name or in the name of any alias ... or in the name of any other entity through which [Palencar] conducts his financial affairs (including ... Teton Millwork Sales).

. Similarly, if Palencar had held a 25% ownership interest in a house, the explicit terms of the court order would have directed Schlossberg to seize the house itself — the asset in which Palencar had an ownership interest.

. If Schlossberg were alleged to have seized the assets of a true stranger to the West Virginia Family Court orders — if he were alleged, for instance, to have seized the assets of a corporation in which Palencar did not hold an ownership interest — I would agree with the majority's invocation of the ultra vires exception to the Barton doctrine. The plain language of those orders, however— regardless of this Court's or TMS's opinion as to their legality — makes clear both that TMS was not such a stranger and that Schlossberg was acting as the court directed him to act.

. In this case, the West Virginia Family Court also indemnified Schlossberg against expenses "suffered or incurred by him in connection with his defense of a claim asserted against him .... arising from or related to his alleged performance or nonperformance of his duties as Trustee or Special Receiver in this action.” (Aplt.App. 73-74.) Therefore, although Schlossberg’s receivership has been terminated, it appears that a judgment against him arising from his performance of his receivership duties might, in fact, affect the res he once held, even though it has already been distributed.

. If I were to reach that issue, however, I would conclude that for substantially the same reasons that inform my Barton analysis^ — i.e., that TMS has not alleged sufficient facts to make a plausible claim that Schlossberg was not acting pursuant to a valid judicial order — the district court correctly dismissed the case on the ground that Schlossberg is entided to absolute quasi-judicial immunity.